ADAM BURGER and CLARA BURGER v. J. H. BOARDMAN et al., Appellants.

**Division One, January 3, 1914.**

1. **SUIT TO RESCIND: Fraud: False Representations: Evidence.** Evidence in a suit to rescind an exchange of lands for fraud *held* to show sufficient false representations to constitute fraud if believed and relied upon by the plaintiffs.

2. ———: ———: ———: **Made by Third Party to Whom Wrongdoer Referred Plaintiff.** One who, preparatory to trading to another lands which the other has never seen, refers

Burger v. Boardman.

that other to a third person for information concerning the lands, is liable for false representations made by the third person, if by their aid the other party is defrauded in the exchange.

3. ———: ———: **Representations Made by Innocent Third Party, Their Falsity Induced by Defendant's Deception.** One who trades to another lands which the other party to the trade has never seen, is liable for representations made by a third person to the other party, where it appears that, some time before the negotiation, the owner had shown to the third person other and much better lands in the same vicinity, describing and naming them as the lands afterward sought to be traded, and by aid of the third person's representations, resulting from the owner's deception, the other party is defrauded in the ensuing exchange.

4. **FRAUD: Liability for Passive Aid Afforded the Perpetrator.** One who knowingly allows himself to be used to consummate the fraud of another, must abide the consequence of such complicity.

5. ———: ———: **Innocent Purchaser.** Owners of a half interest in lands, who trade it to another, the co-owner also trading his interest and conducting the trade so as to defraud the party with whom they trade, cannot defend as innocent purchasers, when facts of which they had notice pointed to the co-owner's fraud.

6. **TITLE TO LAND TAKEN WITHOUT PAYMENT OF CONSIDERATION: Subject to Equities.** One who takes title to land without payment of any consideration holds it subject to all equities.

7. **SUIT TO RESCIND: Evidence: Laches.** Evidence in a suit to rescind an exchange of lands *held* not to show laches, there having been no substantial change in the situation of the parties or in conditions, and the suit having been brought in about five months after the fraud was discovered.

8. **APPEAL: Equity Suit: Evidence.** The Supreme Court weighs the evidence on appeal in an equity suit, and when the decree is amply supported by other evidence it does not consider the admissibility of certain testimony to which objections are made.

9. **SUIT TO RESCIND: Improvements: Rents: Evidence.** Where in a decree for the rescission of an exchange of lands, the defendants are allowed $2100 for completing a house on the lands on the theory that the evidence showed the house complete to be worth that much more than when they took it, although $1000 or $1200 was all that was required for the work, and when the rents charged them for the lands while in their

Burger v. Boardman.

possession are shown to be reasonable, there is no basis for their contention, in their appeal, that they were erroneously charged with "profits and permanent improvements."

10. **PROCEDURE: Insane Defendant.** Even though a defendant be insane when a suit is begun it is the insane person who is sued, though service upon the guardian is required in order that he may perform his statutory duty to defend all actions instituted against his ward.

11. ————: **Defendant Adjudged Insane After Trial but Before Referee's Hearing.** Evidence was heard in a suit to rescind an exchange of lands in May, 1909, and the cause was continued to July, 1909, when it was taken under advisement. Defendant Boardman was adjudged insane in the probate court October 6, 1909. October 28, 1909, the trial court appointed a referee to take an accounting. The parties were duly notified and appeared before the referee December 29, 1909, defendant Boardman appearing both in person and by counsel. Due notice was served upon Boardman's guardian but he did not appear. The matter was continued to January 10, 1910, and on that date Boardman appeared in person and by his guardian, was offered as a witness in his own behalf and testified. The referee filed his report February 14, 1910, and defendants filed their exceptions thereto on the same date. A copy of the record showing the judicial determination of Boardman's insanity and the appointment of his guardian was then filed and defendants objected to the rendition of judgment, but in vain. Motions for new trial and in arrest were filed and overruled, but the record does not show who signed them. *Held*, that the decree must be sustained although rendered after defendant Boardman was adjudged insane. His absence when the referee was appointed was not fatal, and, in view of the presumption that the trial court followed the law, the record sufficiently shows that his guardian acted for him, after he was declared insane, in all matters in which such action was necessary.

12. ————: ————: **Title of Cause.** Where a defendant became insane after the trial of a cause, but prior to the hearing before a referee and before the final decree, his guardian appearing and acting for him after he was adjudged insane, an objection that the guardian's name was not written into the title of the cause is highly technical and not material.

Appeal from Butler Circuit Court.—*Hon. J. C. Sheppard*, Judge.

AFFIRMED.

*J. R. Young, A. B. Garrett, James A. Finch, Charles E. Hannauer, Marshall Arnold, G. R. Daugherty* and *Marion C. Early* for appellants.

(1) J. H. Boardman was adjudged insane, and the management of his business affairs and his estate were placed in the hands of a guardian and curator long before the final decision and decree of the trial court was rendered. Yet, with full knowledge of this fact, the decision and decree were rendered against said Boardman without his guardian and curator being made a party to this suit. This is reversible error. Ashby v. Winton, 26 Mo. 210; Lumber Co. v. Oliver, 65 Mo. App. 435; Berkin v. March, 18 Mont. 152; Jones v. Steele, 36 Mo. 324. (2) The finding that appellant Boardman was the agent of Leo Dohogne is not sustained by the evidence, and is reversible error. Griswold v. Hass, 145 Mo. App. 578; Mitchell v. Sanford, 149 Mo. App. 418; Pallman v. Schaper, 158 Mo. App. 615. (3) There were no confidential relations shown to exist between the parties calculated to give appellant, J. H. Boardman, unusual or undue influence over the respondents, whereby he would be able to overreach them in their business dealings. They were in every way on equal footing with said Boardman. If, by the exercise of inferior judgment merely, in making a trade, persons enter into dealings which afterwards prove to be unsatisfactory, equity will not afford them relief from such error. This principle is elementary. Dillman v. Nadlehoffer, 119 Ill. 567. (4) Where a person to whom representations are made does not rely thereon, but makes independent investigations, he cannot subsequently avail himself of the falsity of such representations, even if they were false and made with evil intent. He must be able to show that he relied solely upon the statements made by the person charged with fraud. Fauntleroy v. Wilcox, 80 Ill. 477; Douglas v. Littler, 58 Ill. 342; Hanna v. Ray-

254 Mo. 16

burn, 84 Ill. 533; Shram v. O'Connor, 98 Ill. 539; Crocker v. Manly, 164 Ill. 282. (5) The doctrine of *caveat emptor* applies to an exchange of real estate as in any other purchase or sale of property. There was nothing to prevent respondents from going to the counties of Wright and Texas, and inspecting the lands before purchasing or exchanging. If they counted the distance too great to go and inspect, they could have declined to trade. There was certainly no compulsion or undue influence brought to bear upon them. They were free to act as they chose. Equity will not relieve persons from the consequences of mere lack of discretion or of unsound judgment in their dealings. (6) Respondents are guilty of laches in waiting six months after seeing the Wright and Texas county lands before complaining or bringing their action. The evidence indicates that they were satisfied at first, their dissatisfaction being an afterthought, produced by a change of conditions occurring after the deal had been consummated. (7) The court erred in sustaining the finding of the referee charging Dohogne with profits and permanent improvements to the Scott county lands. Dohogne had paid amounts in cash. Under the referee's finding Burger is to have these benefits and still Dohogne is called upon to pay over again the same moneys. This was error. (8) Even if called upon to account Dohogne was only liable for cash received and nothing more. He should not be required to pay rentals on vacant property.

*M. E. Morrow, Lew R. Thomason* and *Robert Lamar* for respondents.

(1) Even if vendee was induced to make the trade by the combined false representations of defendant and certain information received from some other sources, he is entitled to recover. Becraft v. Grist, 52 Mo. App. 586; Chan v. Reid, 18 Mo. App. 115; Saunders v. McClintock, 46 Mo. App. 223; Bruce v. Burr, 67 N. Y. 237.

(2)   The subject-matter of the contract being at a distance from respondents, and to go see it involved trouble and expense, they had a right to rely on the representations of appellants.   Bishop v. Seals, 87 Mo. App. 256; Dunn v. White, 63 Mo. 181.   (3)   Defendants Boardman and Leo Dohogne were jointly interested in the lands in question for their mutual profit; and the declarations and representations of one touching the subject-matter of their joint ownership bind the other.   Henslee v. Cannefax, 49 Mo. 295; McKnight v. Ratcliff, 44 Pa. St. 586; Vreeland v. Stone Co., 29 N. J. Eq. 188.   Nor need the Dohognes have known the falsity or fraud of his representations, or that he in fact made any, in order to be charged with its civil liabilities, if they have undertaken to receive and retain the benefits of the contract made under such fraud. "All who get gain by fraud must bear the legal consequences of the wrong."   Vreeland v. Stone Co., 29 N. J. Eq. 195; Castle v. Bullard, 23 Howe, 189; Simmons v. Oil Co., 61 Pa. St. 202; Chester v. Dickerson, 54 N. Y. 1; Miller v. Barber, 66 N. Y. 558; Harnblower v. Crandall, 7 Mo. App. 220, 78 Mo. 581; Stanhope v. Swafford, 80 Iowa, 45; Durant v. Rogers, 87 Ill. 508. (4)   When a party takes advantage of another's distressed condition to gain an unconscionable advantage, court of equity will assist the injured party and set aside contracts so entered into.   Lappen v. Crawford, 186 Mo. 462; Turley v. Edwards, 18 Mo. App. 676; Fout v. Giraldin, 64 Mo. App. 165.   (5)   Dohognes were not innocent purchasers of their interests in the Burger lands.   Fitzsimmons v. Joslin, 21 Vt. 129; Garrett v. Horton, 16 N. Y. 469.   (6)   Respondents had a right to rely upon the representations as to value, location and improvements of the Ozark lands, as they did not see them.   Warner v. Winfrey, 142 Mo. App. 303; Kendrick v. Ryus, 225 Mo. 150; Clinkenbeard v. Weatherman, 157 Mo. 105; Morris v. Rathburn, 49 Mo. 91.   (7)   It is not even necessary for respondents to

show that they have sustained pecuniary damages to entitle them to rescind in equity. 14 Am. & Eng. Ency. Law (2 Ed.), 140; MacLaren v. Cochran, 44 Minn. 255; Valton v. Assurance Co., 20 N. Y. 32; Smith v. Countryman, 30 N. Y. 670. (8) Appellants were not even entitled to allowance the trial court gave them for improvements put on the Scott county land while in possession as fraudulent grantees. Sayer v. Devore, 99 Mo. 455. (9) Boardman's agency for Dohognes, if not clearly established by the latter's words and acts prior to the closing of the trade with the Burgers, is established beyond the possibility of a doubt, by the fact of the Dohognes' subsequent ratification of Boardman's trade, accepting the fruits and benefits of his acts and retaining the same. They must, therefore, assume the burdens of his acts. Turner v. Railroad, 51 Mo. 501; Bank v. Gay, 63 Mo. 33; Beagles v. Robertson, 135 Mo. App. 306; Grover v. Hawthorne, 121 Pac. 808; Bodine v. Berg, 82 Atl. (N. J.) 901; Kurtz v. Payne Inv. Co., 135 N. W. 1075. (10) Any fraud perpetrated by an agent on a third person in the course of his employment, and for the benefit of the principal, is imputed to the principal, whether he had actual knowledge of it or not. Darks v. Gro. Co., 146 Mo. App. 246; Keyser v. Kinkle, 127 Mo. App. 62; Judd v. Walker, 215 Mo. 312.

BLAIR, C.—From a decree for plaintiffs in the Butler Circuit Court rescinding, on the ground of fraud, an exchange of lands, canceling certain deeds upon condition and stating an account, defendants have appealed.

At the time (1908) of the occurrences which gave rise to this suit Adam Burger, who was sixty-six years old, owned and, with his wife and coplaintiff, occupied as his home about 119 acres of land in Scott county. This land adjoined the towns of Edna and Ancell, and the evidence justifies the conclusion that it was worth

about $100 per acre. It was subject to two deeds of trust securing an aggregate of $1750.

Plaintiffs are Germans and not fully conversant with English though their testimony indicates they have a very fair vocabulary of ordinary English words.

Defendant Boardman moved from Wright county to Scott county about March, 1907, locating in a town very near the Burger farm. Boardman had formerly lived in Webster and Wright counties. He had had considerable experience in dealing and trading in Wright county lands, and about the time he removed to Scott county he and defendant Leo Dohogne had jointly acquired 480 acres of land in Wright county and 200 acres in Texas county, Missouri. The first mentioned tract was known as the Garrett place. It was twenty miles from the railroad, rocky, hilly and unimproved except, perhaps, for a small log cabin which was little more than a ruin. A portion of the Garrett place previously had been cultivated but some fifteen years before the exchange now sought to be rescinded it had been abandoned and the improvements, including fences, burned. Subsequently brush and trees grew up on the previously cultivated portion, many of the trees having grown to a diameter of four inches or more. About eighty or 100 acres of the 480 in this tract could have been cleared and cultivated as before but the soil was thin and worn out. This tract was about two miles from Manes, a village of about 150 souls. This description and history, in essential particulars, sufficiently applies to the Texas county tract that it need not be separately described. For these two tracts defendants Boardman and Leo Dohogne paid three dollars per acre in March, 1907, and took title by the same deed, share and share alike. According to the evidence they paid more than the lands were worth either then or at the time of the exchange with the Burgers, in February, 1908. The Burger land in Scott county was crossed by a railroad and had on it a very good dwell-

ing house and barn, several small houses or shanties and one uncompleted eight or nine room concrete house, finished "up to the roof." Boardman and the Dohognes knew the Burgers and the Burger land very well. Defendant Leo Dohogne was born and raised almost or quite in sight of the place and all his life had known Adam Burger. He (Leo Dehogne) was cashier of a bank in the town of Kelso in which his father, defendant Constantine Dohogne, seems to have been interested, and both of them were perfectly familiar with the Burger land and, before the exchange was consummated, knew to what extent it was encumbered. Leo Dohogne had never seen the Wright and Texas county lands but his father, Constantine Dohogne, had and had been over part of it. From the testimony of the two Dohognes, father and son, it appears that the father, Constantine, bought the half interest in these tracts in March, 1907, but that he and his son, defendant Leo, owned it jointly, the legal title, however, being put in Leo Dohogne's name.

In 1907, as a result of an expensive illness and obligations contracted in connection with the erection of the concrete house, Adam Burger became indebted to the extent of several hundred dollars and this indebtedness with the encumbrances upon his land and the so-called panic of 1907 seems to have agitated him considerably and he began to take measures looking to a readjustment of his affairs to the end that he might rid himself of all indebtedness. Sometime in the fall of 1907, or the early part of the following winter, he visited Boardman at his store in Kelso and disclosed his desire to dispose of his Scott county farm and home in such way as to rid himself of debt and secure other unencumbered property for his equity. Boardman thereupon called to his aid an old acquaintance named Short, who lived in Wright county and was also in the real estate business, and Short came to Scott county and he and Burger entered into an arrangement

whereby Short agreed to pay Burger $1800 and convey to him 160 acres of land in Wright county in consideration of the conveyance to him by Burger of twenty-five or twenty-six acres of the 119 acre tract. This seems to have been a very fair arrangement. Very soon thereafter, February 11, 1908, Boardman visited the Burger home and a contract was dictated by Boardman, drawn by one of his clerks and signed by plaintiffs and Boardman, whereby Boardman agreed to convey to plaintiffs his one-half interest in the Wright and Texas county tracts in exchange for 21½ acres of the Burger farm, including the improvements. At the same time another contract was drawn, concerning which defendants' witness Donnenmueller, the draftsman and Boardman's employee, says: "Well, it was a short form of a contract for Mr. Leo Dohogne. Mr. Leo Dohogne hadn't made up his mind that evening to come in a half interest, and we drew up a contract that if Mr. Leo Dohogne wanted to come in that he could later on." Leo Dohogne was not present then, but witness Donnenmueller testified he thought he (Dohogne) "was implicated in it" at that time. On this occasion Boardman called for and took away plaintiffs' copy of the contract with Short, and it is heard of no more. Short's contract eliminated Boardman and the latter did not relish this. Plaintiffs say Boardman told them Short would not deal further with them because he objected to their religion. Boardman says plaintiff said they preferred to deal with *him*. Boardman, in the first instance, had, he says, approached the Dohognes but they raised an objection to the title to Burger's land—an objection subsequently discovered to have no foundation. Boardman says the Dohognes had been "working with" him "to some extent" theretofore. After Dohogne objected to the title, Boardman, so he testifies, then took the matter up with Short, who agreed to go in with him. Subsequently Boardman went to see Short and discovered he "didn't

have any money and couldn't furnish the stuff," and then he says he "came back and got Leo Dohogne to go in with" him "and his (Leo's) father furnished the money to raise the mortgage."

Plaintiffs never saw the Wright and Texas county lands until they moved to Wright county after the trade was made. They testified that Boardman represented that the lands were about five miles from Mountain Grove, a flourishing town on the St. L. & S. F. R. R., were fertile and well improved; that there were practically no rocks; that the expense of hauling them off would be twenty or twenty-five dollars; that the land was worth twenty-five dollars per acre and the Texas county tract was particularly fine, "just as level" as one of plaintiffs' fields, having good fences, houses sufficient for tenant houses and a "big red barn" and orchards and strawberry beds.

There is evidence that plaintiff Adam Burger desired to visit Wright and Texas counties and examine the lands offered but Boardman discouraged this, saying it would be "wasting money." Boardman himself testified he told Burger that about 260 acres of the land were cleared but a "few saplings that had growed up on it" would have to be cut down and that he told the Burgers that the land had "laid out" about eight years and, if fenced would "grow most anything, such as clover, timothy, or anything that would grow in that latitude;" that it would "grow reasonable corn, for the altitude." He asserted he also told them that there were no improvements; that the land was twenty miles from the railroad and that the timber consisted of small white oaks, chiefly available, in the circumstances, for cordwood only but some might be used for telephone poles.

Otto Donnenmueller testified that while he was drawing the contract above referred to Boardman said to plaintiffs: "You don't need to take my word about this land. Ask Otto. He has seen the land." Witness

says he then "explained the land" known as the Garrett farm—the Wright county tract. Witness told plaintiff he had been on that tract and that to his "knowledge it is pretty nice tract of land." Plaintiffs asked him how many acres were cleared and he told them that "to the best of his knowledge and judgment" there "must be about eighty acres of it in cultivation—that is, cleared." He says he told them there was some good timber but not much, but that there was a great deal of "wood timber." Plaintiffs asked about fences, and witness says he told them he saw a little rail fence as he passed along the road and a small log cabin near a corn patch in the bottom. Boardman then told plaintiffs that "that scope down in the bottom of (near) that little log cabin belongs to this 480 acre tract." Witness says that on this occasion Boardman, referring to this same land, said to plaintiff: "It is three miles from town," and witness said: "No, it is two miles and a half from town and twenty miles from the railroad town." He says he "didn't mention no town, but said twenty miles from the railroad town."

Defendant Leo Dohogne was a notary. He drafted one of the deeds plaintiffs executed and took their acknowledgment thereto. He delivered his deed to plaintiffs for one-half interest in the Wright and Texas county lands on February 25, 1908. Plaintiffs testify he then told them they were getting "nice land." He says he "merely wished them success." The deed from plaintiffs to Boardman for the larger part of their farm and the deed from Boardman and wife to Leo Dohogne for his share of the Burger farm were executed and delivered the same day. These last two deeds and that from plaintiffs to Boardman conveying the 21½ acres covered by the contract of February 11, 1908, were all filed for record February 26, 1908.

Somehow in the course of affairs Short, who has been previously mentioned, became again involved in

the negotiations and acquired a small portion of the Burger land.

In March, 1908, plaintiffs sold their personal property at public auction and moved to Wright county. Visiting their newly acquired property they found they had been fleeced and appealed to Short, who brought an attorney to them and advised them to keep the matter quiet for a while. Subsequently, plaintiffs employed their present attorneys, who instituted this suit.

There was evidence that the general reputation of defendant J. H. Boardman and plaintiff Clara Burger for truth and veracity was bad. The evidence as to Boardman's reputation covered every community in which it was shown he ever lived. There was also evidence of statements by Adam Burger to the effect that he was relying upon information from others than Boardman, and statements tending to show that he knew the facts concerning the Wright and Texas county lands before the exchange was consummated. There was also evidence of statements by Boardman to third persons after the consummation of the trade like those plaintiffs say he made to them during the negotiations.

Plaintiffs never recorded their deeds but commenced this suit August 13, 1908. Short was one of the original defendants but upon being summoned he immediately contracted to reconvey to plaintiffs all the land he had received in the transaction, and was omitted from the amended petition.

The taking of evidence was concluded July 8, 1909, and the court took the matter under advisement.

On October 28, 1909, the court appointed a referee to take evidence and state an account for its information.

The referee took evidence and filed his report in February, 1910. Exceptions thereto were overruled, and thereafter a decree was entered for plaintiffs, and various deeds executed by plaintiffs were decreed to be

canceled upon plaintiffs' reconveying the lands con-
veyed to them and paying the amount the court found
they owed defendants, $2246.92.

Other facts necessary to a decision of the questions
presented will be stated in the course of the opinion.

I.   It is contended that (1) the evidence is insuffi-
cient to warrant the conclusion that Boardman mis-
represented the Wright and Texas county lands, and
(2) plaintiffs did not rely upon the representations
Boardman made, if any.

1.   There is a conflict of evidence upon the ques-
tion of the value of the Wright and Texas county lands.

**Suit to Rescind: Fraud: False Representations.** Plaintiffs called witnesses who had been
born and raised in the vicinity and who
had known the lands from boyhood and
who owned near-by property and were
perfectly familiar with land values in
that neighborhood.  Of defendants' witnesses some live
in Scott county and had visited Wright county a time
or two and had seen part of the lands in question as
they drove along the road, and some lived in Wright
county, but eighteen or twenty miles away, and had
never been over the land carefully, and several had
not seen it at all for years.  Boardman and Dohogne
paid three dollars per acre for these lands in March,
1907.  In view of all the evidence we are convinced this
was a large price and that the 680 acres were actually
worth no more than $1500.  Just how a fair return on
even this sum could be got from them does not appear.
Boardman admits he told plaintiffs 260 acres of the
680 acres were cleared and could be put in cultivation
by cutting a few saplings, and the evidence makes it
clear this statement was absolutely false.  Not over
100 acres of the 480 in Wright county and not over
thirty acres of the 200 in Texas county had ever been
cleared, and the former had been abandoned fifteen
years and the latter ten years before and had grown up

in brush and trees, numbers of the latter being four inches or more in diameter. No such acreage as Boardman stated was cleared was at all susceptible of cultivation if cleared. The statement he admits he made that all crops grown in that latitude could be grown on this farm was false. The soil, where there was any, was thin, and the land was broken, hilly and rocky—rocks "as big as a house" on parts of it. The statement he made that the land would grow "reasonable corn for the altitude" was also false, as clearly appears from the comparison of these lands with other farms in the immediate neighborhood and the crops they produced. The statement made by Donnenmueller to plaintiffs while the contract was being drawn, on February 11, 1908, and when Boardman referred plaintiffs to him, was also very well calculated to deceive. He says he told plaintiffs in Boardman's presence that "to his knowledge it was a pretty nice tract of land" and that "to the best of his knowledge and judgment there must be about eighty acres of it in cultivation—that is, cleared." This statement referred to the Wright county tract.

That these representations were made is admitted. That they were false is indisputably established, and that, if they were relied upon and induced the exchange, they constituted a fraud upon plaintiffs is clearly the law. [Clinkenbeard v. Weatherman, 157 Mo. 105; Stonemets v. Head, 248 Mo. l. c. 262.]

2. But it is argued that plaintiffs did not rely upon the representations Boardman made, whatever they were, but sought other counsel.

Boardman testified he told Adam Burger he would not trade unless he, Burger, went first to see the land and that Burger told him he would take the word of Joe Blattel, Frank Blattel and Otto Donnenmueller for it; that he had seen them and "knew what he was doing." Boardman further swears he then told Burger he wouldn't trade at all unless Burger would

take the word of others and rely solely on what they said. Burger denies this and testifies he relied on what Boardman told him about the land.

Frank Blattel was dead at the time of the trial, and Otto Donnenmueller was Boardman's clerk and drew the first contract between Boardman and plaintiffs, and it was at this time he told plaintiffs of the land, at Boardman's instance and in his presence, and misdescribed it, as appears from the statement.

Joe Blattel was called as a witness and testified he had visited Wright county in 1907 with Boardman and Boardman had shown him a place he said was the Garrett place. Witness said he talked with Burger about this tract before the trade was made and described the part of it he saw. He testified this land was about five or six miles from Manes and it took two hours to drive out there from that village. The land he saw had not been "turned out long" for he saw corn rows on it; there was fine pasture and some fine white oak on it. Boardman saw witness two or three weeks before the trade with Burger was closed and asked if witness had talked with Burger about the land and witness told him he had and had told Burger he ought to go and see it, and Boardman said: "Yes, that is right; just tell him the truth."

For his own representations and those of Donnenmueller, having referred plaintiffs to him, Boardman is certainly responsible, and the evidence makes it reasonably clear that Joseph Blattel, who seems to be an honest and straightforward man, had never seen the Garrett place but that Boardman had shown him another tract under that name. Blattel's description of the place he was shown by Boardman does not fit the Garrett place either as to location, character or condition of the land, and it is a reasonable conclusion that Boardman had deceived him by showing him, in 1907, a different tract and thus prepared for himself a disinterested witness who would, with the best of

intentions, mislead a prospective purchaser, and whom he could, with perfect safety to his plans, urge to "tell the truth" when he found a buyer. His approaching Blattel on the subject before the trade was consummated is not out of harmony with this theory, and Blattel's evident honesty and his palpable misdescription of the Garrett place cannot be explained on any other.

In these circumstances Boardman must be held responsible, legally and morally, for the misdescription Blattel gave Burger of the Garrett place.

Boardman says Burger told him he was relying upon what Blattel told him about these lands. He must have known Blattel was describing to Burger the tract he, Boardman, showed him under the name of the Garrett place. Blattel's description shows conclusively he had never seen the Garrett place and Boardman must have known he did not show it to him. Board-man, therefore, knew Burger was relying upon the false description of the land he had implanted in Blattel's mind by showing him a better tract under the name of the Garrett place. The misdescription Blattel gave Burger was as much Boardman's own as if he had himself voiced it.

There was no evidence as to what Frank Blattel, who had died, had told Burger. Frank was shown the same land shown Joseph Blattel and at the same time.

Burger testified the Blattels told him generally about the country in Wright and Texas counties but did not give him any particular description of the tracts for which he was trading.

If it be conceded, however, that he relied upon Donnenmueller and the Blattels, yet their representations, in law and morals, were Boardman's for all the purposes of this case, and he must be held responsible for the fraud those representations aided him to effect.

Fraud:                 II. It is insisted that the Dohognes
Liability       made no representations to plaintiffs
for Aiding
Active          concerning the lands and therefore the
Wrongdoer.     decree is erroneous as to them.

The legal title to one half interest in the Wright
and Texas county tracts was in Leo Dohogne. He had
never seen the lands but his father, defendant Constantine, had and had advised the purchase of them in 1907.
It is morally certain Leo Dohogne was told by his
father the location, character and condition of the
lands, and it is absolutely certain they both knew that
three dollars per acre was the price they paid for it
less than a year before. Both knew the Burger farm
and knew its value and both knew Boardman was
trading for it. They also knew the half interest in the
Texas and Wright county tracts in Leo's name, which
cost them $1020 in 1907, was to be delivered to the
Burgers for about one-half the equity in their farm.
If the Burger place was worth $100 per acre, and the
weight of the evidence is that it was, the Dohognes
knew it and therefore knew that the interest which cost
them approximately $1000 less than a year before was
being used to secure from the Burgers an interest
worth nearly $5000. They knew the Burgers had never
seen the lands for which they were trading and they
knew these lands were unoccupied and produced no
income. Leo Dohogne drafted one or both the deeds
executed by plaintiffs and had this additional means
of knowledge of the particulars, besides what Boardman told him. That plaintiffs would be practically
pauperized by the exchange the Dohognes, being men
of affairs and acumen, must have known.

As a matter of fact they did not say anything to
plaintiffs calculated to deceive them. It is also doubtless true that Boardman pointed out that he proposed
to trade his half interest to the Burgers in any event
and thus place them in partnership with Dohogne—a

situation the Dohognes seemed to have thought undesirable. That they actively and openly participated in Boardman's fraud is not shown by this record. It was not necessary for them to do so for them to be affected by the consequences.

The circumstances of the transaction of which the Dohognes were apprised, as above stated, were such that they could not ignore them and then set up want of notice of Boardman's fraud. Those facts were sufficient to put them on notice. They were enough to have shocked them into attention to the fact that their neighbors were in the hands of an unprincipled swindler. As pointed out in a like case (Eck v. Hatcher, 58 Mo. l. c. 240, 241) many years ago: When one knowingly allows himself to be used to consummate the schemes of another, he must abide the consequences of such complicity. If he is really ignorant of these schemes, and ignorantly allows himself to be used in this way, he must be charged with gross inattention to his own interests, and a disregard of all the ordinary rules of prudence. Facts of which the Dohognes had knowledge pointed with certainty to Boardman's fraud and duplicity, and they cannot defend as purchasers without notice. [Massey v. Young, 73 Mo. l. c. 271, 272; Conn. Mut. Life Ins. Co. v. Smith, 117 Mo. l. c. 292, 293; Taaffe v. Kelley, 110 Mo. l. c. 136, 137; Sensenderfer v. Kemp, 83 Mo. l. c. 588, 589.]

Whether or not Constantine Dohogne was in equity part owner of the interest the legal title to which was in Leo Dohogne's name, he was his son's adviser in the matter of the trade whereby the son acquired the legal title to part of the Burger lands, and it is inconceivable that he could have been ignorant of the facts known by his son when both the son and Boardman discussed the proposed trade with him or in his presence. He furnished the money to take up the mortgage on Boardman's interest in the lands traded to the Burgers and counseled his son, defendant Leo,

Burger v. Boardman.

throughout the matter. He is in no better position than the son—nor by his answer does he plead good faith and want of notice.

III. It is suggested that Mrs. Boardman did not participate in her husband's fraud and the decree is therefore erroneous in so far as it devests her of title to the portion of the Burger farm deeded to her. She paid nothing for the land she got and consequently it is subject to all equities in her hands.

*Equities: Voluntary Conveyance.*

IV. It is argued that plaintiffs were guilty of laches. There is no evidence of any such substantial change in the situation of the parties or in conditions as to warrant the application of that doctrine. The suit was brought in about five months after plaintiffs moved to Wright county.

*Laches.*

V. Evidence of certain statements made by Boardman after the trade was objected to but admitted. These statements were substantially in accord with some of the representations plaintiffs testify Boardman previously made to them to induce them to trade. Their competence as evidence in chief need not be discussed since all this evidence has been ignored by us. In addition, the representations admitted by Boardman on the witness stand and those proved by his witnesses Donnenmueller and Blattel, as above pointed out, are fully sufficient to sustain the finding below, and it is upon these the affirmance of the judgment in that respect is grounded.

*Appeal: Equity: Evidence.*

VI. It is said in the brief for appellant that Dohogne was erroneously charged with "profits and permanent improvements to the Scott county lands" and that in no event should Dohogne be charged with rentals of that property.

*Rents and Improvements.*

254 Mo. 17

As a matter of fact the trial court allowed defendants a credit of $2100 for completing the concrete house, whereas the evidence was that $1000 to $1200 was all that was required for that purpose. This allowance was made on the theory that the evidence showed that the completed structure was worth $3000 and that Burger had expended only $900 upon it before conveying the land. To put it mildly, this allowance was, in the circumstances, liberal. Defendants cannot complain of it and plaintiffs are not appealing. As to the rentals charged, the evidence is that the sum allowed was the reasonable rental value of the land for the period it was in defendants' possession. There is nothing in this assignment.

VII. It is insisted that the decree must be reversed because of the fact that Boardman was adjudged insane prior to the rendition of the final decree. In this connection the facts are that the evidence was heard in the Butler County Circuit Court in May, 1909, and the cause continued to July, 1909, when it was taken under advisement. Boardman was adjudged insane in the probate court of Scott county October 6, 1909.

On October 28, 1909, in this cause, the trial court appointed a referee to take an accounting. The parties plaintiff and defendant were duly notified, and on December 29, 1909, appeared before Hon. Nat C. Whaley, the referee, either in person or by counsel, defendant Boardman appearing both in person and by counsel, Hon. J. R. Young. Due and formal notice of this hearing was served upon Peter Welter as the guardian of defendant Boardman but he did not appear. No evidence was taken on December 29th but the matter was continued until January 10, 1910. On this date, the record recites, "defendant J. H. Boardman appeared in person and by his guardian, Peter

Welter.'' Boardman was offered as a witness in his own behalf and testified before the referee.

February 14, 1910, the referee filed his report and the record recites that ''defendants filed their exceptions'' thereto on the same date. One of the exceptions was sustained and the rest overruled.

A certified copy of the record of the Scott county court showing Boardman had been adjudged insane October 6, 1909, and Peter Welter appointed his guardian, was then filed. On the ground of this showing defendants objected to the rendition of judgment. This objection was overruled and judgment rendered.

Motions for new trial and in arrest were filed and overruled but the record does not show who signed them.

Even in case a defendant is insane at the time a suit is begun it is the insane person who is sued (Collins v. Trotter, 81 Mo. l. c. 280) though service upon the guardian is required (Sec. 514, R. S. 1909) in order that he may perform his statutory duty to defend ''all actions instituted . . . against his ward.'' [Sec. 497, R. S. 1909.] That it is the better procedure to make the guardian a formal party to the record is beyond question, but does it follow that the failure to do so in this particular case necessitates the reversal of this decree?

Judgments for insane plaintiffs, suing in their own names, have been upheld by this court (Koening v. Railroad, 194 Mo. 564; Allen v. Ranson, 44 Mo. l. c. 265) and the decisions and the statutes make it clear that the chief end of both is the protection of the rights of the incompetent.

In this case Boardman was sane when sued and sane during the actual trial of the vital issues. There can be no question that the suit proceeded properly against him in his own name during this time. The appointment of the referee was made in the exercise of the court's statutory power and to that appointment

no objection is now or has ever been suggested. It resulted in a saving of costs and in securing allowances to Boardman which he could not possibly have obtained had the court entered the decree on the evidence originally offered. The real ground, however, for holding that the guardian's presence at the time the referee was appointed was not so essential that his absence renders the whole . decree erroneous is, as stated, that the situation at the time fell clearly within the statute (Sec. 1996, R. S. 1909) and the court's power to refer on its own motion was neither conditioned upon the guardian's consent nor to be affected by his objection. Even were this not true, the guardian's subsequent appearance before the referee and his failure to object to the report when it came in, on the ground he was not in court when the referee was appointed, would preclude the objection on that ground now. [Collins v. Trotter, 81 Mo. l. c. 283, 284.]

The guardian, responding to his statutory duty (Sec. 497, R. S. 1909) and a formal notice, duly served, appeared for his ward before the referee. That he conducted his ward's case during that hearing must now be conclusively presumed since that was his duty, and the record gives no hint to the contrary. It was also his duty to follow the case in its subsequent course. The statute required this and the bond he gave was conditioned that he would perform all his duties under the law. The record does not show he did not do so. It fails to show who signed the exceptions to the referee's report and the motions for new trial and in arrest of judgment. The trial court proceeded to hear these and rule upon them, though advised that Boardman was then under guardianship. It is to be presumed that the trial court followed the law in its rulings until the contrary appears, and it will therefore be presumed that the trial court on examining the exceptions and motions found that the guardian

was actually the moving party and was defending the action as the statute required him to do.

With these facts and presumptions in mind it follows that this record sufficiently shows that Boardman acted for himself while sane and that his lawful guardian acted for him at all times and in all matters when and in which such action was necessary under the statute after he was put under guardianship.

The objection that the name of the guardian was not written into the title of the cause is highly technical. It is particularly so in this case since the very style of the case is correct to the time of the referee's hearing.

Title of Cause.

In Hunter v. Kansas City Savings Bank, 158 Mo. 262, the facts were that a suit had been instituted previously against "Harry F. Rose, guardian of Robert Hunter" and a judgment rendered and property sold thereunder. Suit to enjoin the enforcement of this judgment was begun and the trial court dismissed the bill. The question raised was not exactly like that in this case but the reasoning in that case is fully applicable here. The trial court found that since the guardian was served with process and appeared and defended, the omission from the title of the cause of the name of the insane person was not a matter of substance, could be cured by amendment after the second suit was brought, and in any event could not have affected the substantial rights of the insane person, and therefore was such a defect, if any, as the statute commands courts to disregard at all stages of an action.

This court adopted the trial court's reasoning and affirmed the judgment.

So, in this case, the fact that the name of the guardian was not actually inserted in the title of the case, that title being entirely correct and properly designating all the parties when the suit was brought and until the hearing before the referee, and the guar-

St. Louis v. Glasgow.

dian having duly appeared for his ward at that time and during subsequent proceedings, is purely technical, worked no injury to anyone and must be disregarded. The judgment is affirmed.  *Brown, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court. All the judges concur.