MARY M. BEIL v. CLIFFORD W. GAERTNER, Guardian of the Person and Estate of MARY M. BEIL; CLIFFORD W. GAERTNER and EDITH GAERTNER, Appellants.—No. 39833.—197 S. W. (2d) 611.

Division One, October 14, 1946.

Rehearing Denied, November 11, 1946.

*Herbert W. Ziercher* and *Hans Wulff* for appellants.

*Louis E. Miller, Miller & Landau* and *B. Sherman Landau* for respondent.

620

BRADLEY, C.—This is an appeal from a judgment of the circuit court of St. Louis County setting ▉ aside, on the ground of fraud, a judgment of the probate court of said county adjudging respondent to be a person of unsound mind, and appointing appellant Clifford W. Gaertner guardian of her person and estate. The judgment, in addition to setting aside the adjudication as to plaintiff being of unsound mind, removed Gaertner as guardian and directed that he account for funds of respondent amounting to $7,747.05. Hereinafter we refer to respondent as plaintiff and frequently we refer to appellant Clifford W. Gaertner as the doctor.

These contentions are made: (1) That the circuit court did not have jurisdiction of the cause; (2) that plaintiff did not have the legal capacity to maintain the cause; and (3) that the facts do not support the judgment.

Defendant Clifford W. Gaertner is a physician and defendant Edith Gaertner is his wife. The doctor's office is in St. Louis, but he resides at 21 Clayton Terrace, St. Louis County. Prior to the beginning of her present troubles plaintiff occupied her home at 616 West Marceau Street, St. Louis, where she had resided for more than 40 years. Her husband died November 9, 1942. Defendant had been the family doctor of plaintiff and her husband for some 25 or 30 years. Plaintiff was about 75 or 76 years old in December, 1943, but lived alone. Her husband was a baker and also a street car motorman. They had two sons, Joe and George. Joe died at the age of 24, some 30 years ago. George is a machinist and is 56 years old. The family was hard working and frugal, and at the time of the husband's death, he and his wife owned their home, 616 Marceau, and a separate house and lot adjoining, and had several thousand dollars in cash and securities. Through the years the doctor acquired the complete confidence and trust of plaintiff. The record shows that she not only trusted him, but worshiped him. Mrs. Gaertner testified that plaintiff "was crazy about" the doctor; that "she idolized him"; said he was "the nearest thing to God." Other witnesses said that plaintiff considered the doctor as one "too good to die."

According to the doctor he, about the middle of December, 1943, and because of his long friendship and sympathy for plaintiff, took her from her home in St. Louis to his home in St. Louis County and, according to defendants' theory, plaintiff by that move changed her residence from St. Louis City to St. Louis County. Mrs. Gaertner said that plaintiff came to their home December 15, 1943, and remained until July 26, 1944, except for a few days in December when she went back to her home to have her cats and dog killed, and in April 1944, when the Des Peres River overflowed plaintiff's home. However, there was considerable evidence that plaintiff was in her own home for a substantial part of the time between December 15, 1943, and July 26, 1944. It is conceded that plaintiff was in her home

on many occasions between December 15, 1943 and July 26, 1944, but the doctor said that he would take her there in the morning and then at the end of the day he would drive by for her.

July 5, 1944, the doctor filed his affidavit in the probate court of St. Louis County, alleging that plaintiff was a person of unsound mind; incapable of managing her affairs; and asked that an inquisition be had. According to the return plaintiff was served with a copy of the affidavit, and on July 19, 1944, a hearing was had; an attorney was appointed to represent plaintiff and in her absence she was found to be a person of unsound mind and incapable of managing her affairs. On the same day, July 19th, the doctor filed application to be appointed guardian of the person and estate of plaintiff and was so appointed. July 26, 1944, he filed a petition in the probate court alleging that plaintiff had become "unruly" and was "causing much trouble among the people where she has been associating and with whom she is living." It was alleged that because of such, plaintiff should "be placed in an institution." And the doctor alleged that he had "found out" that he could place plaintiff in the Manchester Nursing Home in St. Louis County for $100 per month. An order was made committing plaintiff to said Home, and on that evening (after dark) the doctor, in company with a friend, picked up plaintiff at her home in St. Louis; told her he was taking her out to his home, but took her to the Nursing Home. She was considered as a mental case and was assigned to a ward in which were 15 or 20 mental patients. When it dawned on plaintiff, after arrival at the Nursing Home that night, what was taking place, she endeavored to resist, but to no avail.

August 31, 1944, the doctor filed inventory of plaintiff's property. This showed notes $10,085; cash, $1,020; goods and chattels, $127.20; two post dated checks for $225 each, a total of $11,682.20. September 16, 1944, plaintiff filed in the circuit court the present cause, and filed amended petition November 24, 1944. September 18, 1944, Gertrude Beil, the wife of plaintiff's son, George, filed in the probate court a petition asking that the custody of plaintiff be given to her. The doctor vigorously resisted such change of custody and change was denied. Also, on September 18, 1944, Mrs. Marie Ritter, a granddaughter of plaintiff, filed a petition in the probate court asking that plaintiff be released from confinement in the Nursing Home and be permitted to return to her own home in St. Louis, or be permitted to take up residence with some friend or relative. The doctor again vigorously resisted such, and such was denied. October 16, 1944, of its own motion, the probate court made an order changing plaintiff's custody from the Nursing Home to that of Gertrude Beil, the daughter in law, and at the time of the trial of the present cause plaintiff was with the daughter in law.

The trial court, on September 17, 1945, after a hearing, refused to grant plaintiff any relief in the present case, and dismissed her petition. Later the case was reopened, additional evidence heard, and on December 26, 1945, a judgment was entered for plaintiff setting aside the judgment of the probate court, removing Dr. Gaertner as guardian and ordering him to account, as stated supra. The above gives the background and some of the high points of the troubles and vicissitudes that came to plaintiff after December 15, 1943. Other facts will be stated in the course of the opinion.

The burden of plaintiff's case is that Doctor Gaertner and his wife, principally the doctor, perpetrated a fraud upon the probate court and upon plaintiff in order to acquire her money and property. As we have stated defendants' contentions, the first one is that the circuit court did not have jurisdiction of the cause. If such be so, then that is the end of the matter so far as concerns this cause. In the assignments defendants say that the court erred in assuming jurisdiction over the person of plaintiff and the subject matter of her action. Defendants contend that the present cause is a collateral attack on the judgment of the probate court, and that if plaintiff is entitled to the relief sought in her petition she must first seek such in the probate court. The present cause is not a collateral attack upon the probate judgment adjudging plaintiff to be a person of unsound mind and appointing the doctor her guardian; but the present case is a direct challenge of the validity of such judgment. "A collateral attack is an attempt to impeach a judgment, whether interlocutory or final, in a proceeding not instituted for the express purpose of annulling the judgment." State ex rel. Van Hafften v. Ellison et al., 285 Mo. 301, 226 S. W. 559, l. c. 563, 12 A. L. R. 1157. See also, Hockenberry v. Cooper County State Bank of Bunceton et al., 338 Mo. 31, 88 S. W. (2d) 1031, which was an equity suit (as is the present case) to set aside for fraud a judgment of the probate court. We rule that the circuit court had the necessary jurisdiction to entertain the cause.

Did plaintiff have the necessary legal capacity to maintain the cause? In the brief defendants say that one, under adjudication as a person of unsound mind, cannot maintain an action in his own name. These cases are cited: Baker v. Smith's Estate, 226 Mo. App. 510, 18 S. W. (2d) 147; Hayes et al. v. Miller, 81 Mo. 424; Redmond v. Quincy, Omaha & K. C. R. Co., 225 Mo. 721, 126 S. W. 159. The Baker case does not rule the question. The Hayes case and the Redmond case hold that when one has been adjudged to be of unsound mind and has a guardian it is the duty ▮ of the guardian to prosecute and defend all actions instituted on behalf of or against the ward. The rulings are based on what is now Sec. 470, R. S. 1939, Mo. R. S. A., Sec. 470. In the Baker case a husband adjudged to be of unsound mind and who had a guardian was joined as a party plaintiff

in his wife's suit. It was held that such was a misjoinder and ground for dismissal.

But the mere fact that one is of unsound mind does not make him incapable of suing or being sued. Allen v. Ranson et al., 44 Mo. 263; Koenig v. Union Depot Company, 194 Mo. 564, 92 S. W. 497; Burger et al. v. Boardman et al., 254 Mo. 238, 162 S. W. 197. In the Burger case the court said [254 Mo. l. c. 259]:

"Even in case a defendant is insane at the time a suit is begun it is the insane person who is sued (Collins v. Trotter, 81 Mo. l. c. 280) though service upon the guardian is required (Sec. 514, R. S. 1909) in order that he may perform his statutory duty to defend 'all actions instituted . . . against his ward.' (Sec. 497, R. S. 1909). That it is the better procedure to make the guardian a formal party to the record is beyond question, but does it follow that the failure to do so in this particular case necessitates the reversal of this decree? Judgments for insane plaintiffs, suing in their own names, have been upheld by this court (Koenig v. Railroad, 194 Mo. 564; Allen v. Ranson, 44 Mo. l. c. 265) and the decisions and the statutes make it clear that the chief end of both is the protection of the rights of the incompetent."

Shields v. Shields, 26 Fed. Supp. 211, district court Western District of Missouri, was in habeas corpus. The court considered the cause even though the plaintiff had been adjudged by the probate court as of unsound mind and was under guardian, as here, and as here, it was claimed that the probate proceedings were vitiated by fraud. In the circumstances of the present case we rule that it was proper for plaintiff to proceed in her own name.

Are the facts sufficient to support the judgment? Plaintiff's case, as stated, is based on the contention that Dr. Gaertner and his wife perpetrated a fraud upon plaintiff and the probate court in order to get plaintiff's money and property. Defendants claim that they are in no wise responsible for plaintiff coming to their home. They say that she asked to be taken into their home. It is claimed that in December, 1943, plaintiff was sick and after she recovered she reminded Mrs. Gaertner of a remark that she (Mrs. Gaertner) made to plaintiff shortly before or after the death (November 9, 1942) of her husband. According to defendants, Mrs. Gaertner had said to plaintiff, "My latch string will always be out to you." And defendants say that when plaintiff recovered from her sickness in December, 1943, she reminded Mrs. Gaertner of the latch string statement, and asked "if the latch string was still out", and that Mrs. Gaertner said it was, and thereupon plaintiff asked to be taken to their home and the doctor took her.

The record shows that the doctor took over the handling of plaintiff's money and securities, or much of it. He says that he did not handle her securities prior to her husband's death, but he and plaintiff had a

joint savings account in the Southern Commercial Savings Bank, St. Louis, and this account shows deposits as far back as December, 1941, and withdrawals as far back as May, 1942, while the husband did not die till November 9, 1942. Although the savings account was in their joint names, the doctor conceded that no part of the funds was his. On many occasions, according to the doctor, he and plaintiff went to the bank together and withdrawals in cash would be made, and that the plaintiff would take the cash to her home in St. Louis where she had a safe. He said that plaintiff ''did funny things, war loans and the war and she decided she wasn't going to keep any money in the bank before that was revealed, as she put it, and make her buy bonds'' (sic). In January, 1944, after plaintiff was taken out to defendant's home, $4,756.81 was withdrawn from the savings account and the account closed. The doctor was with plaintiff at the bank when this money was withdrawn; he drove her to her house with the cash; went in the house with her, but did not know whether she put the money in the safe. After remaining in plaintiff's house awhile on this occasion, she and the doctor drove to the doctor's home ''without the cash,'' so far as he knew. The receipt given at the bank for this withdrawal was dated January 17, 1944, and was signed only by the doctor.

In December, 1943, at defendant's home, plaintiff gave to the doctor a list of her securities, notes secured by deeds of trust. The doctor admitted that he made the list as she gave it, and that the list totaled $16,000. Many of these notes were thereafter reduced to cash, and the cash, according to the doctor, was turned over to plaintiff, and that he did not know what she did with it. The record shows a check for $5,125, dated May 25, 1944, and payable to plaintiff. The doctor says he took plaintiff to the bank and that she cashed this check; that after the check was cashed he took her to her home in St. Louis ''and picked her up that night.'' He was asked if he asked plaintiff what she did with ''that cash'' and he said: ''On previous occasions I advised her about keeping any amount of money in the home and she said, 'I had it in the safe for years and never had any trouble.' '' As appears, supra, in the inventory filed August 31, 1944, notes for $10,085, and cash for $1,020 were shown. So far as appears, the doctor disclosed to no one, not even the appraisers, about the securities held by plaintiff in December, 1943, and about the $4,756.81 in cash January 17, 1944, and the $5,125 cash May 25, 1944.

The doctor and plaintiff had a joint safe deposit box (obtained by the doctor) at Tower Grove Bank. And on August 2, 1944, a week after plaintiff was placed in the Nursing Home, the doctor rented a private safe deposit box at the Mississippi Valley Trust Company. The probate judge (Judge Stahlhuth) heard that plaintiff had been in the habit of hiding ''assets and money in various places in her

home," and on September 11th, the probate judge and others visited plaintiff's house in St. Louis and a search was made, but no money was found. Judge Stahlhuth did not go up in the attic, but he was a witness and testified that the attic was searched. September 13th the doctor visited his safe deposit box at the Mississippi Valley Trust Company. September 17th, he spent about a half hour alone in plaintiff's house in St. Louis, and visited the house again on September 18th. September 21st, another search was made of plaintiff's house, and $10,000 in fifty and one hundred dollar bills was found "in the attic and below the steps upstairs to the attic. Judge Stahlhuth testified that had he known about these cash transactions he would not have appointed the doctor as guardian.

At the hearing July 19, 1944, the probate judge asked the doctor: "Do you know what property she has?" He answered: "She has seven thousand dollars, nine thousand dollars in deeds of trust. She holds on to everything she has got. The other day my wife ran across the deeds of trust." Nothing was said about the list of $16,000 plaintiff gave to the doctor in December, 1943, and nothing was said about the $4,756.81 and the $5,125. Also, in the probate court at this hearing, the Judge asked the doctor: "She has no close relatives at all?" He answered: "She has a son who is married and has been at the Alexian Brothers Hospital for observation. On his birthday recently he was taken back again. Very recently he had a backset. She called on him or he called on her and they were having their usual friendly talk." He said nothing of plaintiff's daughter in law, her former daughter in law; her two granddaughters; and her two brothers, all of whom he knew well.

There was considerable evidence on both sides of the question of plaintiff's sanity, and it is conceded that such question is important, but it is not decisive here. The decisive question here is, Was a fraud perpetrated upon plaintiff and the probate court in having plaintiff adjudged to be a person of unsound mind and the consequent appointment of the doctor as her guardian, coupled with sufficient evidence on the question of plaintiff's sanity as to raise a seriously litigable issue? The trial court found that it was the duty of defendants to advise plaintiff of the true nature of the probate proceedings of July 19th; that they wrongfully withheld such advice and encouraged plaintiff "to believe that the purpose was to have the doctor appointed curator of her estate and that because of such plaintiff was induced to refrain from contesting the sanity hearing." The court further found that the doctor, at the sanity hearing, "wilfully and intentionally made false and misleading representations to the judge of said court, and withheld information from the court respecting the plaintiff's estate, her relatives, said defendant's previous handling of the plaintiff's funds and other matters within the knowledge of said defendant."

The court further found that plaintiff's evidence was sufficient to require a retrial of the sanity issue and the question as to whether she was a resident of St. Louis County at the time of the filing of the information on July 5, 1944. Also, it was found that because of the fraud perpetrated on plaintiff she was prevented from taking an appeal, in the time provided, from the judgment adjudging her to be of unsound mind. A fraud can be perpetrated by silence when duty requires one to speak as well as by speaking falsely. Denny v. Guyton et al., 327 Mo. 1030, 40 S. W. (2d) 562, l. c. 590. We think the evidence is sufficient to support the finding on fraud.

Hockenberry v. Cooper County State Bank et al., supra, was to set aside a probate court judgment on the ground of fraud. The trial chancellor set the judgment aside and defendants appealed. The judgment was affirmed. In the course of the opinion the court said [88 S. W. (2d) l. c. 1037] : "Of course, as appellants contend, to be entitled to the relief asked for, respondent must show that she has a valid meritorious defense to the claim upon which appellants obtained judgment. 'It is not necessary to show conclusively that complainant has a sufficient . . . defense, but it suffices to establish good faith and tender a seriously litigable issue.' "

In denying relief before the case was reopened the court said: "Obviously, if the judgment (the probate judgment) was a proper judgment, it cannot be nullified on account of any fraudulent conduct on the part of the party who obtained the judgment." The Hockenberry case was relied upon. We think, however, that the trial court was correct in holding, after reopening the case, that plaintiff's evidence was sufficient to raise a seriously litigable issue on the question of her sanity and her residence at the time of the probate judgment, and at the time of the trial for that matter. And as to the question of fraud, there is nothing in the record that would justify overturning the chancellor's finding on that question.

Defendants complain because the court permitted plaintiff to testify. They say she had been adjudged to be a person of unsound mind and was not competent to testify. Sec. 1895, R. S. 1939, Mo. R. S. A., Sec. 1805, is cited. But adjudication of insanity creates only a prima facie presumption of incompetency which is rebuttable by voir dire examination or otherwise. State v. Pierson, 337 Mo. 475, 85 S. W. (2d) 48, l. c. 53. In the situation we do not think it was error to permit plaintiff to testify. However, her evidence was merely cumulative; besides, this is an equity case tried de novo on appeal, and in such situation, admission of incompetent evidence would not be reversible error. McCormick v. Parsons, 195 Mo. 91, 92 S. W. 1162; Canty v. Halpin, 294 Mo. 118, 242 S. W. 97.

Also, complaint is made because the court did not permit defendants' expert witnesses to again testify after plaintiff had put in expert evidence after the case was reopened. Defendants' witnesses

had already testified at length and there was no reason shown why the same ground should be gone over again.

The judgment should be affirmed and the cause remanded for further proceedings pertaining to the accounting, and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur except *Clark, J.*, absent.