Harold R. HILL and Dorothy H. Hill, his wife, and Spirit of St. Louis Land Company, a Missouri Corporation, Appellants,

v.

SECURITIES INVESTMENT COMPANY OF ST. LOUIS, a Corporation, and Warren H. Wemhoener, Successor Trustee, Respondents.

No. 52757.

Supreme Court of Missouri,
Division No. 2.

Jan. 8, 1968.

Motion for Rehearing or for Transfer to Court En Banc Feb. 12, 1968.

Erwin Tzinberg, Richard A. Roth, Ziercher, Tzinberg, Human Michenfelder, Clayton, for appellants.

Jerome M. Rubenstein, William D. Rund, St. Louis, for respondents; Bryan, Cave, McPheeters & McRoberts, St. Louis, of counsel.

PRITCHARD, Commissioner.

Plaintiffs individually and as sole stockholders of the Spirit of St. Louis Land Company sought by Count I of their petition to cancel a second deed of trust securing a promissory note for $267,957.45 for fraud in the inducement thereof. By Count II of their petition they sought to recover $131,743.48 payments applied by defendant, Securities Investment Company (SIC), upon said note, and by reason of failure of consideration and false representations they prayed for $100,000 punitive damages. Under Count III of the petition an injunction was sought against foreclosure of either the first or second deeds of trust (both held by SIC at the time suit was filed) during pendency of the claim under Count I. A temporary restraining order was granted against the foreclosures and was ordered continued with an additional bond. The injunction was dissolved upon final judgment which was against plaintiffs on all counts.

The relevant allegations of paragraph 4 of Count I of the petition (here paraphrased) are that SIC, through its officers and representatives, represented to plaintiff, Mr. Hill, that: (a) Astron Industrial Associates, Inc. of Florida had acquired the automotive and machinery business of Transcontinental Industries, Inc. of Georgia because Transcontinental had a prospective contract with Chrysler Corporation whereby Transcontinental's business could be expanded substantially, but that $1,200,000 would be needed for the same; (b) $950,000 had been raised and if plaintiffs Hill executed a note to SIC for $250,000 secured by a second deed of trust on St. Louis property (Howell Island) the additional $250,000 could be raised by SIC; (c) said funds would be required for 90 days only at which time at plaintiffs' election the note and deed of trust would be cancelled or plaintiffs could acquire 250,000 shares of Astron common stock at $1 per share; (d) when the Chrysler contract was announced the value of Astron's stock would increase to at least $5 per share; (e) SIC was interested in making certain that the project was successful because it then had an investment in Astron; and (f) SIC had made audits of both Astron and Transcontinental and that they were in sound financial condition and that no risk was involved in the transaction.

With respect to the allegations of paragraph 4 of Count I above, Mr. Hill testified that he was approached in early August, 1964, by Harvey Carnes and Eugene Pontius, respectively of Quincy, Illinois, and Keokuk, Iowa, to become an investor in Astron. Carnes and Pontius were both directors and shareholders in Astron. Mr. Hill was a farmer-investor (being also a businessman in the sand and gravel business, a lumber business and a part owner

of American Motors Inn of Missouri) and resided in Sikeston, Missouri. He farmed and cut timber on Howell Island, the land covered by the deeds of trust here involved. Mr. Hill was not at first interested but later became so when Carnes and Pontius indicated that it was possible to arrange financing so that no money would be required.

Upon Carnes' arrangement, Mr. Hill and his then attorney, David McMahon, met with Mrs. Sylvia Weissman (a loan broker) prior to August 29, 1964. She told him she could get the money to purchase Astron stock from SIC. On August 29, 1964, Mr. Hill, Mrs. Weissman, Carnes, Pontius and McMahon met with Robert Levitt and James Corbett, assistant vice president and vice president of SIC, at the Ambassador Room of the St. Louis Municipal Airport. It is at this meeting that Mr. Hill contends the misrepresentations concerning Astron and Transcontinental were made. There, according to Mr. Hill, Mrs. Weissman explained that a loan could be made to buy stock—for an option on 250,000 shares of Astron which had an impending contract with Chrysler. That contract would make Astron's stock go up in value considerably. Carnes and Pontius, who were coming in as purchasers, agreed. Levitt said he knew of Astron, that they (SIC) were doing business with one of its subsidiaries and wanted Astron to do well. They felt like the Chrysler contract would really cause Astron to go up in value several times. Corbett and Levitt said Astron's financial condition was very good and Levitt said he had personally made some check or investigation of Astron's records and those of the subsidiary (Transcontinental—later Transonic, a wholly-owned subsidiary corporation of Astron) and that they were in good shape; that SIC had loaned money to the subsidiary. It was not disclosed to Mr. Hill that Astron had guaranteed Transcontinental's accounts to SIC, or that Transcontinental owed SIC over a million and a half dollars. Mr. Hill understood Astron was selling the stock to him; he

relied absolutely upon the representations of Levitt and Corbett, and would not have made the purchase had he been told these things.

Corbett told Mr. Hill that SIC would require security. He offered some Arkansas property but from Mr. Hill's financial statement Corbett picked out Howell Island in St. Louis County, being familiar with it and stating it would be acceptable. Mr. Hill stated that the required ninety-day note was rather short, and both Corbett and Levitt said it would not make any difference because when the Chrysler contract was announced Astron stock would go up and more money could be borrowed; that Mr. Hill could "wash it out." The next meeting was on August 31, 1964, at SIC's St. Louis office where Mr. Hill was told by Corbett that they could not make a loan to an individual—it had to be to a corporation. It was decided that the corporation name would be Spirit of St. Louis Land Company, and Mr. Hill, Mr. McMahon and his secretary flew to Jefferson City and completed that incorporation. Mr. Hill and his wife then deeded Howell Island to the corporation. The second deed of trust was prepared and it and a note, $265,957.45, were signed by Mr. Hill. He also signed (without reading) a guaranty of the loan, which he testified was an option agreement to purchase 250,000 shares of Astron stock according to what Levitt told him. The amount of the loan above $250,000 was for expenses and fees according to Mr. Hill. A discussion was had that the loan proceeds would enable Astron to qualify for the impending Chrysler contract. Corbett and Levitt both said it would be turned over to Astron when they had assurance that the Chrysler contract was consummated. Mr. Hill did not know until shortly before the institution of this suit that the $250,000 loan proceeds went to any company but Astron—he learned recently that it went through the subsidiary, Transcontinental or Transonic; and also that Astron had guaranteed Transcontinental's accounts to SIC, which was owed in excess of

a millon and a half dollars. Mr. Hill first learned of the financial condition of Astron and Transcontinental in October, 1964, when he was told that the Chrysler contract had fallen through. He was advised by Mr. Reiter that Astron was suing Chrysler and when it recovered it would be all right again.

Contrarily to the essence of Mr. Hill's aforesaid testimony and allegations, Robert Levitt, called by Mr. Hill as an adverse witness, testified that the purpose of the Airport meeting was to discuss a possible loan to Mr. Hill to purchase Astron stock. On August 29, 1964, Mr. Hill did not ask Levitt what he knew about Astron. Levitt did not recall saying that he was interested in Astron because he was making loans to Transcontinental, its subsidiary, and that both corporations were in good condition. At the Airport meeting Levitt did not tell Mr. Hill that he had gone into Astron's financial condition, that it was sound, that he felt that it was a good investment for him and devoid of risk. He did not hear Corbett tell Mr. Hill those things. Levitt did not hear anyone from SIC tell Mr. Hill that ninety days after the note was executed at his option the note would be cancelled by SIC; or that the interest and maturity date in the note were only for the purpose of having the instruments in a condition where $250,000 could be borrowed on the strength thereof for Astron (as alleged in paragraph 5 of the petition); or that after the Chrysler contract was announced Astron's stock would jump to $5 a share. Levitt denied: Telling Mr. Hill that if he and his wife executed a note to SIC for $250,000 an additional $250,000 would be raised by SIC for Astron's expansion program. He did not make any statement that the proceeds of the Hill loan were to go to Astron. All he knew about where the money was going was that it was going to be used to purchase Astron stock.

Corbett also controverted Mr. Hill's testimony as to what happened at the Airport meeting. He denied making any representations to Mr. Hill, or hearing Levitt do so, that Astron stock would be a good investment for him and that it was sure to go up in value; or that there would be no risk in his purchasing the stock. He denied telling Mr. Hill that the interest and maturity date were only for the purpose of having the instrument in condition whereby $250,000 could be borrowed on the strength of the note for Astron. The $250,000 was sent by SIC to the Barnett National Bank of Jacksonville, Florida, which disbursed the funds as hereinafter set forth.

Upon receipt of the $250,000 remittance from SIC, the Barnett National Bank issued its cashier's check for that amount to Transonic Corporation on September 1, 1964. That check was endorsed to Transcontinental by C. V. Nalley, President. Plaintiffs' Exhibit P, a letter from Transonic of September 1, 1964, shows that 475,000 shares were represented by certificate No. A–5791 in the name of that corporation. Nalley therein directed that 250,000 shares be transferred by the Barnett National Bank to Spirit of St. Louis Land Company and delivered to SIC; 25,000 shares were to be transferred to Carnes and Pontius as joint tenants; and 100,000 shares each were to be transferred to the latter two individually. Nalley testified that the funds never went into Astron's accounts, and the 475,000 shares were not purchased from Astron. (The shares of Mr. and Mrs. Hill's corporation were pledged to SIC also as security for the loan.)

After becoming in default on the note secured by the second deed of trust to SIC, upon recommendation of his counsel at the time, Mr. Louis Shifrin, Mr. Hill executed (under duress, he claimed) Defendants' Exhibit 7 on May 17, 1965. That document grants permission to SIC to purchase the first deed of trust at the time its holder was attempting to foreclose. It recites that the note secured by the second deed of trust is in all respects valid and enforceable in accordance with its provisions. Mr. Hill had made payments on the

second deed of trust note after its maturity, and was unable to, or did not, refinance the loans. Mrs. Weissman testified that she had an oral commitment for a loan from the Bern Company, but Mr. Hill did not give her the necessary information to complete it.

The trial court made findings upon the evidence before it. In substance the conclusions were: That the motivation for Mr. Hill's involvement in the purchase of Astron stock came from Pontius and Carnes to be accomplished through a loan; the court was unable to find that the loan investment in Astron stock was made by Mr. Hill solely on the representations of Corbett and Levitt; Hill had already made up his mind as to the purchase and the (Airport) meeting was for the purpose of determining whether it would be accomplished through a loan. "Hill, under the circumstances, was not acting prudently in making an investment without the benefit of complete objective knowledge of the corporate situation. He was willing to go along, on the basis to be worked out by S.I.C. and his equity in Howell Island. * * * The Court is unable to conclude upon the evidence that Hill was influenced in making the loan upon any misrepresentations by the representatives of S.I.C. at the Airport meeting that there was an impending contract with the Chrysler Corporation that would result in the Astron stock increasing in value from $1.00 to $5.00 a share in 90 days, or that at Hill's option the stock could be returned and the loan cancelled, or that the $250,000 was to be used for purchase of Astron stock directly from that corporation and to be used solely for expansion of Astron."

■ The above recounted sharply *conflicting* testimony of the allegations of misrepresentation affords no basis for this court to overturn the considered findings of the trial court in respect thereof. In such case the appellate court will defer to the findings and conclusions of the trial court upon such conflicting evidence.

Little v. Fox, Mo., 387 S.W.2d 532, 535 [2, 3]; Four-Three-0-Six Duncan Corp. v. Security Trust Co., Mo., 372 S.W.2d 16, 17 [1]. Plaintiffs contend, however, that the trial court found that Mr. Hill did not rely *exclusively* upon the representations made by SIC's agents. Thus there is invoked by plaintiffs the rule "that it is not required that a party rely exclusively on a representation in order that there be liability, the law only requiring that the representation be a material factor influencing final action, the test being whether the injured party would have acted had he known the truth." Cited is Hereford v. Unknown Heirs of Tholozan, Mo., 315 S.W.2d 412, 420 [5, 6]; Jeck v. O'Meara, 343 Mo. 559, 122 S.W.2d 897, 903 [7–9], and other cases and authority announcing that rule. However, the rule is not here applicable. The trial court's finding was that Mr. Hill had already made up his mind to purchase Astron stock before the Airport meeting. The record bears out that finding. The trial court went on to say that it was unable to conclude that Mr. Hill was influenced in making the loan upon any misrepresentations of SIC representatives that there was an impending contract with Chrysler that would result in an increase of value in Astron stock from $1 to $5 a share in 90 days, or that at Mr. Hill's option, the stock could be returned and the loan cancelled or that the $250,000 would be used to purchase stock from Astron directly and to be used solely for its expansion. Plaintiffs say that the trial court *twice* found that misrepresentations were made. It has not been pointed out in their brief any allusion of the trial court as to what the representations were or who.made them. A perusal of the entire finding and conclusion of the trial court does not reveal that. Rather, a fair construction of the entire entry is that there were no representations made by SIC representatives in the material aspects alleged. The further recitals are: "Although the parties immediately concerned, S.I.C., Carnes and Pontius had a common interest in enhancing the financial position of As-

tron and Transcontinental, there is no evidence that they were acting in concert to defraud Hill; nor does the combination of facts presented offer convincing proof of a fraudulent design. For the reasons aforesaid, plaintiffs cannot prevail on an action of fraud." The transcript shows that only Mr. Hill testified that Levitt and Corbett made representations, or "agreed" to representations made by others present as to Astron. As above indicated, Levitt and Corbett denied making any representations. Upon this conflicting evidence the trial court's conclusion that there was no convincing proof of fraudulent design is not clearly erroneous and will not be set aside. Civil Rule 73.01, V.A.M.R.

The trial court made a further conclusion, however, with respect to concealment by SIC's representatives, Levitt and Corbett, of the financial condition, known to them, of the Astron and Transcontinental corporations: "Plaintiffs' case can only be made on the question of whether S.I.C., having superior knowledge of the corporate affairs of Astron and its subsidiary, Transcontinental, had an obligation to reveal the information within its control to Hill at the time he entered into the transaction." It is this aspect of the case with which plaintiffs are mostly concerned in their remaining points on this appeal.

It appears without doubt that Levitt, being present at the Airport meeting, had some knowledge of the financial conditions of Astron and Transcontinental. C. V. Nalley testified that Corbett and Levitt audited Transcontinental's books; that Levitt knew more about that company than he (Nalley) did. And rather conclusively significant is Levitt's "Audit Report" of June 22, 1964, addressed to F. R. Reiter, President of SIC. That report describes the corporate relations among Astron, Transcontinental and Transonic, and indicates that an exhaustive investigation of conditions and factors influencing future business prospects of the two corporations was made. It was recited that Astron was planning to issue a $1.2 million debenture to provide additional working capital primarily for inventory financing. "Upon examining the balance sheet it is evident that Transcontinental is under-capitalized and short of working capital. This is due to overexpansion and will not be remedied until the $1.2 million debenture is issued and the company is able to generate an adequate cash flow." And "Transcontinental Industries has tremendous sales potential. The big question is whether the company can obtain the additional financing required to exploit this potential. At present the company borders on insolvency and is unable to generate the funds required to provide the catalysts for its sales. The financing provided by Securities is supported by plenty of collateral. However, a company that is in as tight a current position as Transcontinental, bears close scrut* ing. No further advances other than those already committed should be made to Transcontinental and Securities must insist upon the prompt payment of future obligations as they mature." These quotations are illustrative of the knowledge which SIC had about Astron and Transcontinental.

■ Although there may exist facts and circumstances upon which there is a duty to disclose facts, Beil v. Gaertner, 355 Mo. 617, 197 S.W.2d 611; Ash Grove Lime & Portland Cement Co. v. White, 361 Mo. 1111, 238 S.W.2d 368; Vendt v. Duenke, Mo.App., 210 S.W.2d 692, no such facts and circumstances here exist. The purpose of Mr. Hill's contact with SIC was to procure a loan in order that he might consummate his predetermined design to purchase Astron stock in this highly speculative venture. He did not look to SIC for advice or information concerning Astron or Transcontinental. "In the application of the rule concerning the duty to speak, however, it must be pointed out that while one cannot properly withhold the truth from those who have reason to expect information from him, those who do not look to him for information and expect no disclosure from him cannot properly complain of his silence or success-

fully contend that he has suppressed the truth. In order that suppression of the truth may constitute fraud, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other and which the other party is entitled to have communicated to him." 23 Am.Jur. Fraud and Deceit, § 78, p. 855. There is no evidence that Mr. Hill was under a delusion as to the facts; there was no relation of trust and confidence in the obviously arm's length transaction of procuring a loan from SIC; and, finally, Mr. Hill being an experienced businessman, worth more than two million dollars, a "self made" man, as the record shows, it is fairly inferable that he did not use due diligence himself in ascertaining the facts. This further finding of the trial court is supported by the record and in reason: "By virtue of the audits and loan situations S.I.C. had superior knowledge of the financial condition of Astron and Transcontinental, but upon the record the court is unable to find Hill was relying on S.I.C. for anything other than a loan. The corporations at that time were operating concerns, the money, although transmitted so as to enhance the financial position of Transcontinental and indirectly Astron, did not directly benefit S.I.C. Although it is charged that if Hill had complete knowledge he would not have entered into the transaction, this is an after the fact contention, not supported by the record." Jones v. Arnold, 359 Mo. 161, 221 S.W.2d 187, is distinguishable on its facts although holding that there is a legal duty to disclose in instances of equality of condition and superior knowledge of the facts by one party. The fraud there was failure to inform defendant remaindermen of the pendency of a suit, to which they had a meritorious defense, which would have cut off their interests as "bodily heirs" remaindermen. Faust v. Parker, 204 Iowa 297, 213 N.W. 794, involved an affirmative misrepresentation of fact (and the speaker had a commission interest in the transaction—compare Cox v. Bryant, Mo., 347 S.W.2d 861). These cases, and others cited, are of no aid to plaintiffs.

The above holding that there was no duty to speak on SIC's part disposes of the Point VI contention that its officers were not innocently silent. No trick or contrivance was shown by the evidence. In Messina v. Greubel et al., 358 Mo. 439, 215 S. W.2d 456, there was definitely inequality of position by defendants, corporate officers and directors, and plaintiff, a mechanic without business experience, additionally an employee of defendants. In Monsanto Chemical Works v. American Zinc, Lead & Smelting Co., Mo., 253 S.W. 1006, the fraudulent statement related to the contract between the parties for the purchase of sulphuric acid, not as here alleged—relating to the separate transaction of stock purchase.

The facts were found against plaintiffs on both Points VII and VIII, respectively: (1) That SIC was not guilty of fraud in not informing Mr. Hill upon learning that the stock was not being purchased from Astron (the conclusion is supported that Mr. Hill had determined to buy Astron stock regardless of its source); and (2) there was no conspiracy entered into by SIC officers to defraud plaintiffs.

Since there was no fraud clearly and convincingly proved, there is no merit in the contention of Point IX that Reiter, Corbett and Levitt were acting within the scope of their employment for SIC, it being liable for resultant damage; or Point X, that the acts of SIC's agents were wilful, wanton or malicious entitling plaintiffs to punitive damages.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

FINCH, P. J., DONNELLY and EAGER, JJ., and FULLER, Special Judge, concur.