**CENTERRE BANK OF KANSAS CITY, N.A., Plaintiff/Appellant, Cross-Respondent,**

v.

**DISTRIBUTORS, INC., Donald Brown, Susan Brown, Raymond Brown, Virginia Brown, Daniel Brown, Mary E. Brown, Defendants/Respondents, Cross-Appellants.**

No. WD 36053.

Missouri Court of Appeals,
Western District.

Dec. 17, 1985.

Motion for Rehearing and/or Transfer
to Supreme Court Overruled
and Denied
Jan. 28, 1986.

Application to Transfer Denied
March 25, 1986.

Loeb H. Granoff, Gregory L. Vranicar, Charles A. Blackmar and Lynne C. Kaiser, Rich, Granoff, Levy & Gee, Kansas City, for plaintiff/appellant, cross-respondent Centerre Bank of Kansas City.

Stinson, Mag & Fizzell, George E. Feldmiller and Don M. Downing, Kansas City, for amicus curiae Missouri Bankers Ass'n.

Willard B. Bunch, Elisabeth R. Sauer and Brian B. Myers, Campbell, Morgan & Gibson, Kansas City, for defendants/respondents, cross-appellants Donald Brown, Susan Brown, Raymond Brown, Virginia Brown, Daniel Brown and Mary E. Brown.

James C. Wirken and Sue A. Sperry, Spradley & Wirken, Kansas City, for defendants/respondents, cross-appellants Distributors, Inc. and Daniel Brown.

Before SHANGLER, P.J., and TURNAGE and BERREY, JJ.

TURNAGE, Judge.

Centerre Bank filed suit against Distributors, Inc. to collect the unpaid balance due on a demand note. The Bank also sued Alan Bronfman on his personal guaranty of the note and Daniel Brown, Mary E. Brown, Raymond Brown, Virginia Brown, Donald Brown and Susan Brown on their personal guaranties of the note. All defendants filed counter-claims against the Bank. A jury trial resulted in verdicts in favor of all defendants on the Bank's claim under the note and on the guaranties and in favor of all defendants on their counter-claims. The jury awarded the defendants a total of $7,528,800 in actual and punitive damages.[1] The court remitted one-half of the punitive damages of $6,000,000 and entered judgment against the Bank on the counter-claims for a total of $4,528,800.

The Bank contends that the trial court erred in allowing all defendants to assert an affirmative good faith defense to the Bank's action on the note. The Bank further contends that the trial court erred in submitting to the jury counter-claims asserting fraudulent misrepresentation based on representations by the Bank that it would continue to extend credit to Distributors, asserting breach of contract on the theory that the parties entered into a new contract which replaced the personal guaranties of the individual defendants, asserting failure by the Bank to disclose the loan was classified a problem loan, and asserting prima facie tort. Reversed and remanded.

The defendants all appeal the remittitur of one-half of the punitive damages. As the judgments are reversed on other grounds, the issue of remittitur is not decided.

Alan Bronfman was the owner of Distributors, Inc., a corporation which distributed kitchen appliances to builders in the Kansas City area. In August of 1979, the Bank extended a line of credit to Distributors in exchange for Distributors signing a promissory note payable on demand. The note was in the face amount of $900,000 and was delivered to the Bank with an Inventory and Accounts Receivable Loan Agreement. The Loan Agreement provided that the note was to be secured by all accounts receivable and inventory of Distributors. In addition, Bronfman signed a personal guaranty of the note. After the Browns had acquired their interest in Distributors, each signed a personal guaranty of the note.

Prior to January of 1980, Bronfman hired Dan Brown as the general manager of Dis-

---

**1.** The jury awarded Distributors $480,000 actual and $1,000,000 punitive damages, Dan $400,000 actual and $1,500,000 punitive damages, Mary $75,000 actual and $500,000 punitive damages, Raymond $140,000 actual and $750,000 punitive damages, Virginia $140,000 actual and $750,000 punitive damages, Don $50,000 actual and $250,000 punitive damages, Susan $50,000 actual and $250,000 punitive damages, and Bronfman $193,000 actual and $1,000,000 punitive damages.

tributors. In January of 1980, Bronfman sold 20% of the stock in Distributors to Dan.

The building industry was depressed in 1979–1980 and Distributors was not making money. Bronfman was interested in selling his remaining stock in early 1981. Dan began to discuss with his father Raymond, and later his brother Donald, the possibility of the Brown family purchasing from Bronfman the remaining 80% interest in Distributors so that Dan could maintain his position in the company. Raymond and his wife, Virginia, lived in Albuquerque, New Mexico, and owned Kitchen Concepts, a small company which manufactured kitchen cabinets. Dan believed Kitchen Concepts would go well with Distributors' kitchen appliance business and that the two operations could be melded.

Distributors purchased its inventory with advances the Bank made under the promissory note. Dan and Raymond were concerned about whether the Bank would continue to extend credit to Distributors if the Browns purchased all of the Distributors' stock. Dan consulted Bill McDaniel, the officer of the Bank who handled the Distributors' loan. Dan told McDaniel that he and his family were thinking of buying Bronfman's stock and inquired if that would bring about any change in the Bank's lending to Distributors. Dan testified that McDaniel told him that so long as Bronfman remained on his personal guaranty, the Bank would continue loaning money to Distributors. The evidence showed that Bronfman was a multi-millionaire while the Browns were of a more modest financial status.

Raymond sent his CPA, Fred Winter, to Kansas City to talk with the Bank. Winter and Dan talked with McDaniel and visited Distributors. Winter reported to Raymond that he believed there was a good working relationship with the Bank but testified that he did not make any recommendation to Raymond on the purchase of Bronfman's stock.

Bronfman sold his remaining 80% interest in Distributors to Dan, Raymond and Donald as of May 1, 1981. Dan purchased an additional 20% which brought his total interest to 40%, Raymond purchased a 40% interest, and Donald purchased a 20% interest.

McDaniel told Dan that the Bank wanted personal guaranties from the Browns and their wives in addition to the guaranty which the Bank had from Bronfman. Dan testified that he obtained the personal guaranties of his wife Mary, of his mother and father, and of Donald and his wife Susan on McDaniel's representations that he was pleased with Dan's performance as general manager of Distributors and that the sale of Bronfman's stock to the Browns would have no effect on the Bank's continuing to make loans to Distributors. Dan testified that McDaniel told him the Bank would continue on the loan if the personal guaranties were given. Dan admitted that McDaniel told him that McDaniel was going to run the continuation of the loan through the Bank's committee.

On August 18, 1981, Dan Brown delivered to the Bank the personal guaranties of all of the Browns for Distributor's note. On August 21, 1981, McDaniel called Dan and told him that the Bank was giving 60 days notice that it was going to demand payment of its note. Dan expressed shock at the decision of the Bank to call the note.

The Bank presented evidence that the Bank had not considered the Distributors' loan to be a good loan. Distributors had been losing money and the statement for fiscal year 1979 showed a loss of over $100,000. The Bank placed the Distributors loan on the Bank's problem list after receiving that statement. This meant the Bank considered the loan to have a high possibility of loss to the Bank. The fact that the loan was placed on the problem list was not communicated to either Bronfman or the Browns. In addition, the Bank was concerned that the inventory list which it received was not accurate because the comptroller of Distributors had reportedly said she could not be certain the cards on which the inventory was kept were reliable.

Barry Myers, the president of the Bank, testified that a number of factors in addition to the losses suffered by Distributors played a role in calling the note due. These factors were the depressed state of the building industry, which had a severe impact on Distributors' business, the problems with the inventory list and the fact that 14% of Distributors' receivables were over 90 days past due. Any receivable over 90 days past due was not considered collateral for the note because of the likelihood that such receivable would not be collected. Myers also testified that the Bank examiners were very critical of the Distributors' loan.

McDaniel testified that he told Dan and Winter that he would recommend that the loan be continued. Even quotes from McDaniel's testimony contained in the Brown's brief to illustrate that McDaniel represented the loan would be continued reveal McDaniel stated he would recommend the loan remain in place.

Prior to the Bank's decision to call the note, McDaniel had been working with Dan in an effort to find another lender for Distributors. These efforts were unsuccessful.

Despite the Bank's notification to Dan that payment on the note would be demanded by October 20, 1981, the Bank actually continued to extend credit to Distributors until December 15, 1981. Between August 19, 1981 and December 15, 1981, the Bank loaned Distributors almost $635,000 and Distributors made substantial payments to the Bank on the loan.

Moreover, after August 20, 1981, the Bank talked with Bronfman about financing for Distributors, and McDaniel met with a venture capital company to try to obtain financing for Distributors. Distributors proposed a controlled liquidation plan to the Bank which called for the Bank to extend credit for four months after October 30, 1981. Although the Bank approved this proposal from Distributors, it was never implemented by Distributors or the Browns.

Despite efforts by Dan and McDaniel to obtain other financing none was found and on December 15, 1981, the Bank demanded payment of its note by December 28, 1981. On December 24, 1981, Dan called McDaniel and told him that he gave up and that he was surrendering all of the assets of Distributors to the Bank. Thereafter, the Bank took possession of the assets and collected part of the accounts receivables and liquidated the inventory. As of the trial the Bank claimed there was a balance due on the note after credits of $277,594.22 plus interest of $100,510.04 and collection expenses of $18,537.22.

The three week trial produced over 2300 pages of transcript and several volumes of legal files.

Subsequent to trial the Bank and Bronfman entered into a settlement so that Bronfman is not a party to this appeal.

The court gave a total of 115 instructions to the jury. The Bank challenges several issues submitted on the ground that as a matter of law such issues were improperly submitted or are not supported by the evidence. These issues will be addressed serially.

### THE DEFENSE OF GOOD FAITH

The Bank first asserts that the court erred in instructing the jury that it could find for Distributors on the Bank's claim on the note, and for all of the Browns on the Bank's claim on their guaranties, if the jury found that the Bank did not act in good faith in the performance or enforcement of its agreement with Distributors. The court instructed the jury that good faith means honesty in fact in the conduct or transaction concerned.

Distributors and the Browns contend good faith, or the lack thereof, is a defense under § 400.1–203, RSMo 1978. Section 400.1–203 states "[e]very contract or duty within this [Uniform Commercial Code] imposes an obligation of good faith in its performance or enforcement." Distributors and the Browns contend the evidence showed an absence of good faith on the part of the Bank in demanding payment of

the note because various loan officers of the Bank thought the Distributors loan was a bankable one, the Bank failed to disclose it was concerned about the loan and that Myers believed the loan was the largest risk exposure in the Bank, McDaniel led the Browns to believe the Bank approved of their buying the Distributors' stock while Myers was preparing to call the loan, and the loan was called only three days after the Browns delivered their personal guaranties even though the financial situation of Distributors was improving after the Browns purchased all of the stock.

The only cases cited or located which have discussed this contention have rejected it. In *Fulton National Bank v. Willis Denney Ford, Inc.*, 154 Ga.App. 846, 269 S.E.2d 916 (1980), a car dealer filed suit against the bank seeking damages as a result of the bank terminating its credit relation with the dealer. The bank moved for summary judgment on the ground that in terminating the credit relation it was exercising its right as the holder of demand notes to call for payment and that such action could not be a viable basis for suit against it. The dealer opposed the banks motion on the ground that there was a genuine issue of material fact as to the bank's good faith in calling the demand notes. The dealer relied strongly on Ga. Code Ann. § 109A–1–203, the section of the UCC which Distributors and the Browns rely on in this case. The court stated the issue presented was whether the decision by the holder of a demand instrument to demand payment must be made in good faith so that such decision can subsequently be attacked by the obligor as having been made under the circumstances in bad faith.

The court quoted 1 Anderson, Uniform Commercial Code 165, § 1–203:3 (2nd ed. 1970), which states that the code provision regarding good faith "in effect states that what is not regulated by the contract should be done in such a way as to show good faith in the carrying out of what is expressed." 269 S.E.2d at 918[2–8]. The court stated that the dealer failed to consider that the due date on a demand instru-

ment is regulated by the contract and is due immediately. *Id.* The court quoted Ga.Code Ann. § 109A–3–122(1)(b) [§ 400.3–122(1)(b) RSMo 1978] which provides that a cause of action against a maker accrues in the case of a demand instrument upon its date or if no date is stated, on the date of issue. The court stated that the only duty under the UCC on a holder of such an instrument is to seek enforcement within the applicable statute of limitations. The court further stated there was no reason why the obligor on a demand instrument should be entitled to contest the holder's decision to enforce payment at any time as being in bad faith when the obligor, by his signature, has agreed that his obligation is immediately due and payable and is subject to no other contingencies. The court added that qualifying the obligation on a demand instrument by requiring the holder to demonstrate his good faith in seeking payment could have no beneficial result for either holders or makers of demand instruments. The court concluded that the Bank's good faith or lack thereof in seeking payment of the demand note was not a genuine issue of material fact.

The court in *Allied Sheet Metal Fabricators, Inc. v. Peoples National Bank*, 10 Wash.App. 530, 518 P.2d 734 (1974), *cert. denied*, 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974), also held that good faith under UCC 1–203 is not a factual issue in determining the banks' right to call a demand note. The court stated that under the terms of the demand note, the good faith provision of the UCC did not create a factual issue as to the bank's right to call the demand note. 518 P.2d at 738 n. 5.

The rationale of *Fulton* and *Allied* is that execution of a demand note constitutes an agreement between the borrower and the lender that the note may be called for payment at any time. Demand instruments are recognized by § 400.3–108, RSMo 1978 and under § 400.3.122(1)(b), RSMo 1978, a cause of action accrues against the maker of a demand instrument on its date or its date of issue. The good

faith requirement of § 400.1–203 is in the performance or enforcement of a contract or duty. The imposition of a good faith defense to the call for payment of a demand note transcends the performance or enforcement of a contract and in fact adds a term to the agreement which the parties had not included. The additional term would be that the note is not payable at any time demand is made but only payable when demand is made if such demand is made in good faith. The parties by the demand note did not agree that payment would be made only when demand was made in good faith but agreed that payment would be made whenever demand was made. Thus § 400.1–203 has no application because it does not relate to the performance or enforcement of any right under the demand note but in fact would add an additional term which the parties did not agree to.

■ This court is not willing to rewrite the agreement which Distributors made that the demand note which it executed could be called for payment at any time by adding a provision that payment could only be demanded in good faith. When the Browns executed their personal guaranty of this note, they knew, or were charged with the knowledge, that the note was payable on demand and under the law the Bank could call the note at any time.[2] The guaranties stated that payment would be made when due under the note. Having guaranteed a note which could be called at any time, a holding that the Bank could only call for payment by exercising good faith would rewrite the guaranties which the Browns gave. If the Browns had desired to impose some obligation on the Bank in connection with the enforcement of the demand note beyond the rights which the law gave to the Bank, the Browns should have written such condition into their guaranties. The Bank could not be required in the name of good faith to surrender its right under the demand note to call for payment at any time.

The Browns rely upon *Skeels v. Universal C.I.T. Credit Corp.*, 335 F.2d 846 (3rd Cir.1964) and *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir.1985). Those cases are inapposite on their facts since both involve a cause of action based on the bank's failure to extend credit suddenly and without notice. Neither case involves facts similar to the present case and this court is unwilling to extend the holdings of those cases to the facts here. Even if such cases were applicable, this court does not find them persuasive in view of *Fulton* and *Allied* and the rational of this opinion.

For the reasons stated, the trial court erred in instructing the jury that if it found the Bank failed to act in good faith a verdict could be returned in favor of Distributors on the note and in favor of the Browns on their guaranties. A defense of lack of good faith was not available in this case and no instruction on good faith should have been given.

### MISREPRESENTATION

All of the Browns submitted as a defense to the Bank's claim against them on their guaranties that McDaniel represented that if each of the Browns signed a guaranty, the Bank would continue to extend credit to Distributors.

Dan, Raymond and Donald submitted their claims against the Bank on the ground that McDaniel represented if Bronfman remained on the guaranty the Bank would continue the loan and as a result they purchased stock from Bronfman. Mary, Virginia and Susan submitted their claims against the Bank on the ground that the same misrepresentation induced them to sign indemnity agreements in favor of Bronfman. All of the Browns submitted claims against the Bank alleging fraudulent inducement in signing the guaranties based on the representation that the

---

**2.** The Browns do not deny the note was a demand note and that this fact was known by them.

Bank would continue to extend credit to Distributors.[3]

Dan testified that for approximately two months prior to June 1, 1981, McDaniel had assured him that the Bank would continue to loan money to Distributors. McDaniel's assurances were that the Bank would continue to extend credit to Distributors so long as Bronfman remained on the guaranty and if the Browns would deliver their personal guaranties to the Bank. Dan also testified that as early as January or February of 1981, he was looking for financing from a source other than Centerre because McDaniel had indicated McDaniel knew Bronfman was considering selling Distributors and was not sure he could persuade the Bank to continue the loan if Bronfman were not involved with Distributors.

Sometime before June 1, 1981, Dan and Donald entered into an agreement with Bronfman for the purchase of Bronfman's stock. Dan stated they made this agreement because Goldstein, a business consultant hired by Bronfman, told Dan that the purchase of Distributors was a fantastic deal. Dan stated, however, that the deal with Bronfman could have been called off if the continued financing of Distributors by Centerre could not be confirmed by Fred Winter, Raymond's CPA.

On June 1, 1981, Fred Winter came to Kansas City and met with Dan and McDaniel. Winter stated he went to the Bank to determine if the Browns had a working relationship with the Bank. He stated that when he left the meeting he felt that they did have a good working relationship. Winter stated McDaniel gave no advice on whether or not the Browns should purchase Bronfman's stock, but from the meeting Winter felt that if Distributors could continue to show progress and profitability there would be no problem with continuing a working relationship. He said McDaniel told them that so long as Bronfman continued on the guaranty, McDaniel did not believe there would be

any problem with the Bank continuing the financing. Winter testified McDaniel did not mention any personal guaranties by the Browns.

Winter further testified he knew banks have loan approval procedures and committees set up to review loans. He also stated he knew that banks review loans on a periodic basis. Winter testified he was aware of these facts when he met with Dan and McDaniel.

Winter returned to Albuquerque and reported to Raymond that he believed there was a good working relationship with the Bank. Winter's report was relayed to Donald. All of the Browns felt Winter's report was favorable and testified that based on his report they decided to proceed with the purchase of Bronfman's stock.

Dan testified that at the meeting with Winter, McDaniel had told him that so long as Bronfman stayed on the guaranty, the Bank would stay with the loan. Dan also testified McDaniel had told him that McDaniel was going to run the loan through the committee.

All of the representations on which the Browns relied were made to Dan and Winter. None of the other Browns talked with anyone at the Bank prior to the time the loan was called, and thus the representations on which the Browns based both their defense and their counter-claim were made to Dan and Winter.

The Bank contends there was no right to rely on McDaniel's representations because McDaniel told Dan the loan would have to go through a bank committee. The Browns stress the representations which Dan testified McDaniel had made to him, but do not refute that Dan testified McDaniel told him that McDaniel would have to run the loan through a committee.

Dan's testimony reveals that McDaniel had told Dan that McDaniel would have to refer the loan to a committee. Dan's testimony further reveals that in January or

---

3. It is obvious that by using the representation as a defense on the Bank's claim and as a basis for recovery against the Bank, the Browns pursued inconsistent remedies. See Election of Remedies, *infra*.

February of 1981, McDaniel had indicated that he was not sure he could persuade the Bank to continue the loan if Bronfman sold all of his stock in Distributors. From Dan's testimony it is clear that Dan was advised on at least two occasions that McDaniel would have to gain approval from a bank committee for the loan to Distributors to be continued. From this it follows that Dan knew McDaniel did not have the sole authority to continue the Distributors' loan. Thus, Dan knew that despite all of the representations which he stated McDaniel had made to him, McDaniel could not speak with finality concerning any future action the Bank might take on the Distributors' loan.

It is apparent from Winter's testimony that he also knew McDaniel did not have the authority to make a decision on whether or not the Distributors' loan would be called. Winter knew banks have loan approval procedures and committees which review loans on a periodic basis. This gave him the knowledge McDaniel could not make a binding representation as to the Bank's future course of action in relation to Distributors' loan.

In addition, both Winter and Dan testified that at various times representations were tied to the continuing profitability of Distributors. Dan also admitted there was no representation the Bank would continue the Distributors' loan indefinitely and he knew that at some time the loan would be terminated.

The evidence in this case clearly shows McDaniel, Dan and Winter each knew McDaniel did not have authority to state what the future attitude of the Bank would be toward the Distributors' loan. Accepting Dan's testimony that McDaniel represented the Bank would continue the loan so long as Bronfman remained on the guaranty and if the Browns delivered their personal guaranties, it is apparent both Dan and McDaniel knew the decision on the loan was not up to McDaniel so that his statement was not the final word on the fate of the loan. In *Messina v. Greubel*, 358 Mo. 439, 215 S.W.2d 456, 459[3, 4] (1948), the court stated that reliance should not be placed upon representations whose falsity is equally known to the parties. It is stated in 37 C.J.S. *Fraud* § 27 p. 267 (1959), that one cannot secure redress for a representation which he knew to be false. In 37 Am.Jur.2d *Fraud and Deceit* § 237 p. 316 (1968), it is stated that there is no right to rely upon representations on the part of one who is informed of the truth before he acts.

The evidence clearly shows Dan was aware of the limitations on McDaniel's authority and the evidence is also clear that Fred Winter was aware of McDaniel's limitations. Both knew McDaniel would not have the final say on the Distributors' loan and knew a continuation of the loan depended on action by bank committees. Given this situation, there was no evidence from which the jury could find that any of the Browns had been misled by McDaniel's representations or that the Browns had a right to rely on such representations when they were informed, or should have been informed, by Dan and Winter of the truth before they acted. Of course the Bank could not be responsible if Winter or Dan failed to reveal to the other Browns the limitations which they knew existed with reference to McDaniel's authority in continuing the loan.

For this reason the instruction submitting a defense to the Bank's claim and as a basis for the Browns counter-claim the representations that the Bank would continue the loan was not supported by the evidence. The giving of such instructions was therefore error.

### ELECTION OF REMEDIES

It should be observed that the Browns on the one hand asserted a defense to the Bank's claim on the guaranty based on the representation of McDaniel, and on the other hand asserted the representation as a basis of recovery on their claim against the Bank. The Browns' theory was that McDaniel fraudulently induced them to sign the guaranty by his representation.

In *Auffenberg v. Hafley*, 457 S.W.2d 929 (Mo.App.1970), the court stated:

> The victim of a fraud may elect to pursue one of the remedies, but once having elected he may not pursue or attempt to intermingle the remedies, for they are wholly inconsistent, the first being a disaffirmance of the contract and the last being an affirmance.

457 S.W.2d at 935[13–15].

Here, the Browns seek to defend against the Bank's claim by claiming the guaranty is void because of the representation. This is a disaffirmance of the agreement. The Browns further seek to recover damages for having entered into the agreement. This is an affirmance of the agreement. The Browns were not entitled to pursue both remedies and the trial court erred when it allowed the Browns to both affirm and disaffirm the agreement. In this case it is of no consequence that the Browns were not required to make an election because the representation could not be relied upon for either the purpose of affirming or disaffirming the agreement. However, the observation is made that the trial court erroneously allowed the Browns to pursue inconsistent remedies and instructed the jury on such inconsistent remedies.

### THE ORAL CONTRACT CLAIM

Dan Brown submitted an instruction authorizing a verdict in his favor against the Bank if the jury found that Dan and the Bank entered into an agreement by which Dan agreed to sign the guaranty and the Bank agreed to continue to extend credit to Distributors. Mary, Raymond, and Virginia each submitted a verdict director which authorized a verdict in their favor on the same ground.[4]

The Bank contends the trial court improperly admitted evidence that McDaniel said the Bank would continue to extend credit to Distributors if each of the Browns delivered their personal guaranty of the Distributors' note because such evidence violated the parol evidence rule. The Browns contend the evidence does not violate the parol evidence rule because the guaranty was not an integrated agreement. They further contend that although they were bound on their guaranty[5] the evidence shows that the guaranty was executed and delivered pursuant to their obligation under the oral agreement.

■ The argument that the guaranty is not an integrated agreement is easily answered. An integrated agreement simply means that the writing in question is a complete statement of the bargain made between the parties. 4 Williston, Contracts, § 636 (3rd ed. 1961). The reason for the rule, of course, is that the parol evidence rule only prohibits evidence of prior or contemporaneous agreements which vary or contradict the terms of an unambiguous and complete writing. *W.E. Koehler Construction Co. v. Medical Center of Blue Springs*, 670 S.W.2d 558, 562[7] (Mo. App.1984). Here, the guaranty stated that "there are no conditions or limitations to this guaranty except those written or printed herein, and no alteration, change, or modification shall be made except in writing" and signed by the parties. This demonstrates that the writing was fully integrated and contained the complete agreement of the parties.

■ The Browns further contend that the evidence of the separate oral agreement for the continuation of credit does not vary or contradict the terms of the guaranty. The guaranty provided that the Browns unconditionally guaranteed payment when due of all indebtedness of Distributors to the Bank. The oral agreement claimed by the Browns would certainly contradict this term. The agreement calls for the Bank to extend further credit to Dis-

---

4. Donald and Susan also sought to submit on this theory but the court for some unexplained reason directed a verdict against them on that issue.

5. Of course this contention is inconsistent with their position at trial where they submitted an instruction which relieved them of liability on their guaranty on the basis of a misrepresentation.

tributors and to not call the note due and in effect means the Browns would not be obligated to pay the Distributors note when it was called due. Thus, the Browns would escape liability because under their alleged oral agreement the note was agreed not to be called in favor of further credit being extended.

A similar situation existed in *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155, 456 N.E.2d 802, 805[3], 468 N.Y.S.2d 861, 864[3] (1983). There, individuals had given the bank written guaranties that a corporation note would be paid when due. The individuals sought to introduce an oral promise by the bank under which the bank would continue to extend credit to the corporation until a date certain. The bank called the note before the date stated in the alleged oral agreement. The court held that the oral agreement would impose an additional condition on the guaranty that further credit would be extended until the date certain. The court held such oral agreement would impermissibly contradict the unconditional promise contained in the written agreement. The court held that evidence of an oral agreement made prior to execution of an integrated written agreement which would vary the terms of the writing may not be received.

▉ In this case, the intention of the parties to create a complete unambiguous guaranty appears on the face of the guaranty. The written agreement is flatly contradicted by the oral agreement which the Browns seek to find from the testimony that the Bank would continue to extend credit to Distributors if the personal guaranties were delivered. The parol evidence rule is a rule of substantive law and not a rule of evidence and evidence offered in violation of it must be ignored. *Koehler, supra*, 670 S.W.2d at 562[7]. Therefore, the evidence of the statement by McDaniel that the Bank would continue to extend credit to Distributors if the Browns delivered their personal guaranties violated the parol evidence rule and such evidence must be ignored. It necessarily follows that such evidence could not be considered for the purpose of establishing an oral agreement between the Browns and the Bank. The court erred in submitting a verdict director which authorized a verdict in favor of the Browns if the jury found an agreement to extend credit to Distributors on the delivery of the Browns' personal guaranties.

## THE FAILURE TO DISCLOSE

All of the Browns, except Dan, submitted instructions which allowed the jury to find in their favor on the Bank's claim under the guaranty if the Bank failed to disclose the Bank had classified the Distributors loan as being a problem loan. All of the Browns, except Dan, also submitted this same failure to disclose as a ground for relief on their claim against the Bank.[6] Raymond and Donald offered a verdict directing instruction predicating recovery for having purchased stock because of this nondisclosure. Susan, Mary and Virginia also submitted this as a ground for relief for having signed an indemnity agreement in favor of Bronfman.

The Browns contend that the Bank had classified the Distributors loan as a problem loan several months before the Bank called the loan in August of 1981, and prior to the time the Browns purchased all of the Bronfman stock. The Browns, as already noted, contend that McDaniel told either them or Fred Winter, the CPA, that it made sense for the Browns to acquire all of the Distributors' stock, that the Bank was pleased with the progress Distributors had made, and that the Bank would continue on the loan so long as Bronfman continued on

6. As already pointed out, the use of fraud as an affirmative defense and as a ground of recovery constituted inconsistent remedies. If the guaranties were obtained through fraud, the Browns had to elect to either defend on the ground the guaranties were void because obtained through fraud or to affirm the guaranty by claiming damages as a result of fraud. Even though the court should have required the Browns to make an election between their remedies, again the matter is inconsequential because the Browns do not show fraud as a matter of law through the Bank's failure to disclose.

his guaranty and if the Browns would deliver their personal guaranties. It has already been held that the Browns did not have any right to rely on these representations. The Browns now contend that at the time McDaniel made such statements the Bank had classified the Distributors' loan as a problem loan, but the Bank failed to notify the Browns or Bronfman that such classification had been made. The Browns contend that if the Bank had told them that the loan was classified as a problem loan they would not have delivered their guaranties and Dan, Raymond, and Donald contend they would not have purchased Bronfman's stock and Mary, Virginia and Susan contend they would not have signed indemnity agreements in favor of Bronfman.

■ The Browns seek to establish a fiduciary relationship between themselves and the Bank and thus establish that the Bank had a duty to disclose its classification of the loan. There is no evidence to show any relationship between the Browns and the Bank other than that of borrower and lender. There is no confidential or fiduciary relationship between a bank and a customer borrowing funds. *Delta Diversified, Inc. v. Citizens & Southern National Bank*, 171 Ga.App. 625, 320 S.E.2d 767, 776[13, 14] (1984). In addition, as the court pointed out in *Hill v. Securities Investment Co. of St. Louis*, 423 S.W.2d 836 (Mo.1968), in quoting from 23 Am.Jur. *Fraud and Deceit*, § 78, p. 855:

> In order that suppression of the truth may constitute fraud, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other and which the other party is entitled to have communicated to him.

423 S.W.2d at 841–42[2].

In the present case, Dan was actually running Distributors and was thoroughly familiar with the company, and therefore the Browns cannot contend that they were looking to the Bank for information concerning the financial well-being of Distributors. Actually all of the Brown's knew

Distributors was in trouble but thought they could turn it around and make it profitable. Moreover, the only information the Bank had concerning the financial strength of Distributors was contained in the reports given to it by Dan and the spot checks which the Bank made from time to time on the inventory and accounts receivable. This undoubtedly accounts for the reason the Browns do not contend that the Bank withheld any information concerning the financial health of Distributors.

■ There was no confidential or fiduciary relationship involved, nor was there any duty on the part of the Bank to disclose its internal classification of the loan. As a matter of law the failure to disclose the classification of the loan did not constitute the type of fraud that would enable the Browns to avoid their guaranties or relieve them of liability on such guaranties.

## PRIMA FACIE TORT

Distributors submitted its claim against the Bank solely on prima facie tort. This cause of action was recognized in *Porter v. Crawford & Co.*, 611 S.W.2d 265 (Mo.App. 1980).

Distributors claim that it made out a case in prima facie tort based on the following evidence: 1) The Bank knew that by calling the note it was effectively putting Distributors out of business, 2) Myers stated that he did not like Dan, 3) Myers did not think Dan was a good manager, and 4) although Distributors had been losing money, after the Browns obtained ownership of all of the stock and Dan had full management responsibility, the company was beginning to turn around and if given time would have become profitable.

*Porter* relied principally on the development of the prima facie tort doctrine in New York. The elements of the tort, as summarized in *Porter* are: (1) intentional lawful act by the defendant, (2) an intent to cause injury to the plaintiff, (3) injury to the plaintiff, and (4) an absence of any justification or an insufficient justification for the defendant's act. 611 S.W.2d at

268[3]. It is highly questionable that the evidence showed that the Bank intended to cause injury to Distributors, but even if that be assumed, under the law as developed in New York, the evidence clearly did not show an absence of any justification for the Bank calling the note. In *Luxonomy Cars, Inc. v. Citibank, N.A.*, 65 A.D.2d 549, 408 N.Y.S.2d 951 (1978), the court considered the action of the bank in accelerating the due date on a note after it had received a financial statement indicating the car dealership had suffered a net operating loss. The court held that regardless of whether or not the bank had breached its loan agreement, "its actions were unequivocally justified vis-a-vis a prima facie tort, because the bank 'had a valid business interest to protect.'" 408 N.Y.S.2d at 954[4, 5]. The court cited *Motif Constr. Corp. v. Buffalo Sav. Bank*, 50 A.D.2d 718, 374 N.Y.S.2d 868 (1975). In *Motif*, the complaint alleged that an agreement to grant building loans to Motif had been breached. The court, in dismissing the prima facie tort claim, stated, "moreover plaintiff does not allege valid causes of action for prima facie tort because defendant had a valid business interest to protect, in declining to carry out its agreement to make advances to plaintiff, in view of plaintiffs financial condition...." 374 N.Y.S.2d at 870[3–5].

More recently in *Feder v. Fortunoff, Inc.*, 123 Misc.2d 857, 474 N.Y.S.2d 937 (Sup.Ct.1984), the court dismissed a prima facie tort claim brought by an individual whose credit card had been repossessed. The court held there was no prima facie tort because the evidence showed the bank "clearly acted in its own economic interest to limit its credit exposure, a valid business interest." 474 N.Y.S.2d at 940[6, 7]. The court relied on *Luxonomy* in its holding.

The facts in the present case bring it within the above New York cases. Distributors had been losing money some time, the Bank had information that inventory figures being supplied to it might be suspect and the percentage of receivables overdue by more than 90 days was considered high. The Bank felt the company was really in a negative position by their own financial statement. In these circumstances the Bank clearly had a valid business reason for calling the note due. This justification alone is sufficient to defeat Distributors' prima facie tort claim.

Further, *Porter* relied on § 870, Restatement (Second) of Torts (1977), and the comment thereunder as a guide for the development of the new form of action denominated as the prima facie tort. The comment to § 870 contains a balancing test for determining whether or not conduct should be actionable under this new cause of action. The comment calls for a balancing of interest among four factors: (1) the nature and seriousness of the harm, (2) the interests promoted by the actor's conduct, (3) the character of the means used by the actor, and (4) the actor's motive. Section 870, Restatement (Second) of Torts, Comments f, g, h, and i, pp. 283–84. In *Lundberg v. Prudential Ins. Co. of America*, 661 S.W.2d 667, 671[3, 4] (Mo.App.1983), this court stated:

With reference to factor (1), physical harm to person or property is weighted more heavily than emotional harm or harm to prospective pecuniary interests; with reference to factor (2), established privileges or rights of the actor are to be afforded proper weight; with reference to factor (3), conduct with offends societal concepts of fairness and morality favor liability; and with reference to factor (4), the degree of malice motivating the actor may be so overwhelming as to tip the scales in favor of liability.

The balance in this case is virtually identical to the balance in *Lundberg*. The nature and seriousness of the harm claimed by Distributors is to prospective pecuniary interests and this weighs in favor of the Bank. Factor 2 weighs in favor of the Bank because the Bank had the admitted right under the law to call the note due at any time. Factor 3 weighs in favor of the Bank because its action was neither unfair nor morally offensive. Factor 4 weighs in favor of the Bank because of its valid busi-

ness interest in calling the note due. Because the Bank had a valid business interest in calling the note, and because the Bank's conduct under the balancing test does not favor liability, the court erred as a matter of law in submitting the instruction to the jury allowing Distributors to recover on the theory of prima facie tort.

The foregoing leads to the following conclusions. The only defense offered by Distributors to the Bank's claim on the note was a failure by the Bank to act in good faith. As a matter of law this defense was not available and the court erroneously instructed the jury to consider a good faith defense. The judgment in favor of Distributors on the Bank's claim is reversed and the cause of action is remanded for a new trial on that claim.

The only basis for Distributors' claim against the Bank was prima facie tort. As a matter of law Distributors did not establish that claim and the judgment in favor of Distributors on its claim against the Bank is reversed.

The defenses of all the Browns were submitted to the jury in the disjunctive. The defense of good faith did not as a matter of law relieve the Browns of liability on their guaranties. The submission on the representations made by McDaniel was not supported by the evidence. If any of the disjunctive submissions lack evidentiary support, the instruction is erroneous and the cause must be reversed. *Miller v. Scholl*, 594 S.W.2d 324, 328[1] (Mo.App. 1980). The same result obtains if any submission is erroneous as a matter of law. Thus the judgment in favor of the Browns on the Bank's claim must be reversed. The Browns also submitted in defense of the Bank's claim a failure of the Bank to give reasonable notice of the disposition of the property securing the loan, that no new value was given for the guaranties and that the Bank changed its agreement after the guaranties were signed. The parties have not briefed or discussed whether or not these submissions were supported by the evidence or were proper as a matter of law. The discussion herein may help decide whether some of these are proper de-

fenses as a matter of law. Because these issues have not been briefed no view is expressed as to their validity. The Bank's claim against the Browns is remanded for further proceedings.

Dan Brown submitted his claim against the Bank on the representations made by McDaniel and on a new oral agreement entered into with the Bank. This court holds that neither of these grounds support a cause of action and the judgment in favor of Dan against the Bank must therefore be reversed.

The other Browns submitted their claim against the Bank on the representations made by McDaniel, on the failure of the Bank to disclose that it had classified the loan as a problem loan and that a new oral agreement had been entered into. This court holds that none of these grounds will support the judgment and the judgment in favor of each of the other Browns against the Bank must therefore be reversed.

The question of punitive damages is not reached because as a matter of law there is no basis on which Distributors or any of the Browns are entitled to recover on their claims against the Bank. Thus, there could be no punitive damages on these claims. The appeal by Distributors and all of the Browns from the action of the court in ordering a remittitur of one-half of the punitive damages is therefore dismissed.

The judgment in favor of Distributors and all of the Browns on the Bank's claim on the note and the personal guaranties of the Browns is reversed and this cause is remanded for further proceedings.

The judgment in favor of Distributors and each of the Browns on their claims against the Bank is reversed. No remand for a new trial is made on these claims.

The appeal of Distributors and the Browns is dismissed.

Costs are assessed against Distributors and each of the Browns.